PEOPLE ex rel. PEABODY v. CHANLER, Sheriff, et al.

(Supreme Court, Appellate Division, Second Department. June 4, 1909.)

1. CONSTITUTIONAL LAW (§ 255*) — DUE PROCESS OF LAW—COMMITMENT OF IN-SANE PERSONS TO STATE LUNATIC ASYLUM—STATUTES—VALIDITY.

Code Cr. Proc. § 454, requiring the jury acquitting accused on the ground of insanity to state the fact with the verdict, and authorizing the court, if it deems the discharge of accused dangerous to the public safety, to order his commitment to the state lunatic asylum until he becomes sane, contemplates that the investigation on the trial into the insanity of accused may satisfy the court that accused is so insane as to be a menace to public safety, and the act is not invalid as authorizing a commitment without notice or hearing.

[Ed. Note.—For other cases, see Constitutional Law, Dec. Dig. § 255.*]

2. CONSTITUTIONAL LAW (§ 255*)—DUE PROCESS OF LAW—DEPRIVATION OF LIB-ERTY.

The plea of insanity is the plea of accused, and he must be regarded as understanding the effect thereof within Pen. Code, § 20, providing that a person cannot be tried when he is so insane as to be incapable of understanding the proceeding, and hence he voluntarily submits the question of his insanity to the court, and, though the direct issue is insanity at the time of the commission of the crime, yet evidence of such insanity may show that it is continuous and incurable.

[Ed. Note.—For other cases, see Constitutional Law, Dec. Dig. § 255.*]

3. HABEAS CORPUS (§ 25*) — COMMITMENT OF ACCUSED ACQUITTED ON THE GROUND OF INSANITY—STATUTES.

A commitment to the State Lunatic Asylum, as authorized by Code Cr. Proc. § 454, authorizing the court when it deems the discharge of one acquitted on the ground of insanity to be dangerous to the public safety, to order his commitment to the state lunatic asylum until he becomes sane, is for the protection of the public, made in the exercise of the police power of the state which permits the restraint of an insane person who at large would be dangerous, and the commitment lasts only so long as accused is insane, and he may at any time under the law have his sanity determined on habeas corpus.

[Ed. Note.—For other cases, see Habeas Corpus, Dec. Dig. § 25.*]

4. CONSTITUTIONAL LAW (§ 255*)—DEPRIVATION OF LIBERTY WITHOUT NOTICE AND HEARING—STATUTES.

The right of one committed on his acquittal of crime on the ground of insanity to the State Lunatic Asylum, as authorized by Code Cr. Proc. § 454, to forthwith institute proceedings to establish his sanity and his right to instant discharge, is sufficient protection of his liberty to meet the constitutional requirements.

[Ed. Note.—For other cases, see Constitutional Law, Dec. Dig. § 255.*].

Gaynor, J., dissenting.

Appeal from Special Term, Westchester County.

Proceedings by writ of habeas corpus by the People of the state of New York, on the relation of A. Russell Peabody, against Robert W. Chanler, sheriff of the county of Dutchess, and another. From an order dismissing the writ, the relator appeals. Affirmed.

See 116 N. Y. Supp. 62.

Argued before HIRSCHBERG, P. J., and JENKS, GAYNOR, RICH, and MILLER, JJ.

Franklin Bartlett, for relator.

Asa Bird Gardiner and Robert C. Taylor, for respondents.

JENKS, J. The point raised is that the statute whereby Thaw was committed is unconstitutional, in that it does not provide for notice and a hearing. Thaw was committed pursuant to a provision contained in that part of the Code of Criminal Procedure which relates to the trial and the verdict. Chapter 3, tit. 7. This provision (section 454) reads:

"When the defense is insanity of the defendant the jury must be instructed, if they acquit him on that ground, to state the fact with their verdict. The court must, thereupon, if the defendant be in custody, and they deem his discharge dangerous to the public peace or safety, order him to be committed to the State Lunatic Asylum, until he becomes sane."

"The practical effect" is that the Legislature has prescribed that a successful defense of insanity shall not as a matter of course be followed by the absolute discharge of the defendant (Gleason v. Inhabitants, 136 Mass. 489, 490), but it may be followed by his commitment until he becomes sane. As such commitment is not a matter of course, but may be made only by that court and only of a defendant in detention whom the court deems dangerous to the public peace and safety if discharged, and the commitment lasts only until the defendant becomes sane, we must infer that the Legislature intended that the court would commit only after its conclusion that at the time of acquittal the defendant was insane so as to be a menace to the public peace and safety. But, as there is no provision for enlightenment of the court in any other manner, it must be that the Legislature intended that the court could rest its conclusion upon the evidence given at the trial and the appearance of the defendant thereat. If the defendant's plea was insanity and it had prevailed, it would follow that insanity was litigated at the trial. Although the inquiry at the trial would be directed to insanity at the time of the commission of the offense, yet the evidence might establish that such insanity had not ceased, but had continued, that it was chronic, that the defendant might then or thereaft-

er in the very nature of his disease be subject to recurrences of a state of mind like unto that in him when he committed the alleged crime. And, moreover, such evidence might well bear directly upon the condition of the defendant at the time of trial. For Gray, J., speaking for the court in People v. Hoch, 150 N. Y. 291, 44 N. E. 976, says:

"Of course, the issue turns upon the prisoner's mental condition at the time of the homicide—whether he was laboring under such a defect of reason as to render him incapable of knowing the nature and quality of the homicidal act, or was incapable of knowing that it was wrong. But there is no apparent reason, and I am aware of no authority, for holding that, in addition to all the other facts, the jury may not be informed by one competent to speak as to the mental condition of the defendant at the time of his trial. He stands before them accused of the crime with the plea of insanity to shelter him from a conviction at their hands, and in their consideration of his plea for exoneration no competent evidence bearing upon his mental condition at the time of the homicide or since should be excluded, and the evidence objected to certainly cannot be said to be prejudicial to any substantial rights of the accused, or to contravene the demands of justice."

Thus the Legislature might well have contemplated that the court might reach its conclusion, enlightened as the court was said to be in People v. McElvaine, 125 N. Y. at 608, 26 N. E. 933:

"It had previously tried the defendant for the same crime and had heard the evidence adduced by the defendant to support the plea of insanity. It was familiar with the appearance and conduct of the prisoner during the period of that trial, and had sufficient grounds before it to judge as to the probability of his present sanity."

It is common knowledge that insanity may be chronic, yet with lucid intervals; that it is marked by periods of quiet and of storm; that one insane may at times demean himself as if entirely normal, and yet, without warning, suddenly become as dangerous as a Malay running amuck. There is no method in actual madness. The plea of insanity is that of a defendant, and he must be regarded as understanding the effect thereof. Section 20, Pen. Code. He therefore voluntarily submits the question of his insanity to the court of his trial. Although the direct issue is insanity at the time of the commission of the alleged crime, yet evidence of such insanity may also show that it is chronic and continuous or progressive and incurable, or evidence may be given "as to the mental condition of the defendant at the time of his trial." People v. Hoch, supra. It cannot, then, be said that a defendant who makes the plea of insanity and seeks to establish it did not have notice under this provision of a hearing that might reveal his condition of insanity at the time of his trial, and a hearing of which the result might be such commitment upon acquittal for insanity under the said provision of the Code of Criminal Procedure, as was made in this case. It cannot be said that the trial of a defendant intends that he is sane, for the reason that an insane man may be tried if he is competent to understand the proceeding and to make his defense. Section 20, Pen. Code; Freeman v. People, 4 Denio, 9, 47 Am. Dec. 216. The law makes a distinction between the mental irresponsibility which precludes trial for a crime, and that which excuses from liability for a crime. An act done by a person who is an idiot, imbecile, lunatic, or insane is not a crime, but one is not excused from criminal liability

as an idiot, imbecile, lunatic, or insane person,. or of unsound mind, except at the time of the commission of the alleged criminal act he was laboring under such defect of reason as either not to know the nature and quality of the act he was doing, or not to know that the act was wrong. But the prohibition against trial, sentence to punishment, or punishment is that one cannot be tried or sentenced or punished while in a state of idiocy, imbecility, lunacy, or insanity so as to be incapable of understanding the proceeding or making his defense. ·Sections 20, 21, Pen. Code. Such a commitment is not for the punishment of such a defendant, for there can be no punishment for him who has been acquitted, but it is for precaution for the public, made in the exercise of the police power of the state, which permits the restraint of an insane person who at large would be a danger to the peace and safety of the people. The commitment can last only so long as the defendant is insane, and he has the right at any time under the law to have his sanity determined upon habeas corpus.

Moreover, Freund on the Police Power says (section 255):

"The right to apply at any time for discharge has been held to reconcile even the absence of hearing in the first instance with the constitutional requirement of due process, and if upon such proceeding the petitioner is found to be insane, his detention may be continued." ·

In Dowdell's Case, 169 Mass. 387, 47 N. E. 1033, 61 Am. St. Rep. 290, the petitioner applied for his discharge from commitment, in that the statute was unconstitutional because it did not require any notice to the insane person before the commitment was signed, and so violated the provisions of the Declaration of Rights that no subject shall be deprived of his liberty but by the judgment of his peers and the law of the land, and the provisions of the fourteenth amendment of the Constitution of the United States that no state shall deprive any person of liberty without due process of law. And the court said:

"The order of commitment settles nothing finally or conclusively against the person committed. It does not take from him the care or control of· his property. It is not equivalent to the appointment of a guardian over him. Leggate v. Clark, 111 Mass. 308, 310. He is entitled as a matter of right to institute judicial proceedings under the statutes, to determine the necessity and propriety of his confinement. He is not denied the same ·protection of the laws which is enjoyed by all other persons in the commonwealth under like circumstances. He is not, therefore, deprived of liberty without due process of law, according to the judicial construction which has been put upon those words. Marchant v. Pennsylvania Railroad, 153 U. S. 380, 14 Sup. Ct. 894, 38 L. Ed. 751; Hallinger v. Davis, 146 U. S. 314, 321, 13 Sup. Ct. 105, 36 L. Ed. 986; Caldwell v. Texas, 137 U. S. 692, 11 Sup. Ct. 224, 34 L. Ed. 816; Dent v. West Virginia, 129 U. S. 114, 9 Sup. Ct. 231, 32 L. Ed. 623; Missouri v. Lewis, 101 U. S. 22, 25 L. Ed. 989. * * * And the right to institute judicial proceedings under the statutes is a sufficient protection of the liberty of the subject to meet constitutional requirements. Wares, Petitioner, 161 Mass. 70, 74, 36 N. E. 586; Miller v. Horton, 152 Mass. 540, 543, 26 N. E. 100, 10 L. R. A. 116, 23 Am. St. Rep. '850; Farnham v. Pierce, 141 Mass. 203, 6 N. E. 830, 55 Am. Rep. 452; Jones v. Robbins, 8 Gray (Mass.) 329, 341; Chavannes v. Priestley, 80 Iowa, 316, 45 N. W. 766, 9 L. R. A. 193; Doyle, Petitioner, 16 R. I. 537, 18 Atl. 159, 5 L. R. A. 359, 27 Am. St. Rep. 759."

In Le Donne's Case, 173 Mass. 550, 54 N. E. 244, Le Donne was found guilty of manslaughter and sentenced to the state prison. Before expiry of his term, he was adjudged insane and removed to the

asylum on a warrant. The contention was that the statute whereunder he was removed to the asylum was unconstitutional. The court, per Morton, J., said:

"We discover nothing unconstitutional in the statute under which the petitioner was removed to the asylum and is detained there. It is not unconstitutional because it authorizes the commitment and detention of an insane person without any previous hearing, or without an order from any judge. The petitioner 'is entitled as a matter of right to institute judicial proceedings under the statutes, to determine the necessity and propriety of his confinement.' The order of commitment settles nothing finally or conclusively against him. 'And the right to institute judicial proceedings under the statutes is a sufficient protection' of his liberty 'to meet constitutional requirements.' Dowdell, Petitioner, 169 Mass. 387, 47 N. E. 1033, 61 Am. St. Rep. 290."

I think that this provision should be upheld. See, too, Ex parte Brown, 39 Wash. 160, 81 Pac. 552, 1 L. R. A. (N. S.) 540, 109 Am. St. Rep. 868; People ex rel. Mooney v. Walsh, 21 Abb. N. C. 299; and, further, Regina v. Oxford, 9 C. & P. 525; Queen v. Martin, 2 Nova Scotia, 322.

In fine, I think that the Legislature contemplated that upon the trial for a crime the investigation into the insanity of the defendant at the time of the commission of a crime pleaded by the defendant might satisfy the court that, if the defendant were entitled to be freed absolutely upon an acquittal based upon such insanity, the verdict would not only exonerate the defendant, but, in effect, might let loose one then so insane as to be a menace to public peace and safety, and that, therefore, the Legislature expressly limited the effect of such an acquittal in the exercise of the police power, so that it might not be an absolute discharge in course, but that the court might order the detention of the defendant as a dangerous insane person until his reason was restored. And I think that such a defendant by this provision of the Code of Criminal Procedure had notice and a hearing that contemplated the process whereby he might thus be committed, and that, in any event, the provisions of express law whereby he could forthwith institute proceedings to establish his sanity and his consequent right to instant discharge satisfy the safeguards invoked against this provision of the law.

The order should be affirmed.

HIRSCHBERG, P. J., and MILLER, J., concur.

RICH, J. In June, 1906, Harry K. Thaw was indicted for the crime of murder in the first degree, and was tried in the following January. During the progress of the trial the learned counsel appointed a commission upon the application of the district attorney to ascertain and report the then mental condition of the prisoner under the provisions of section 658 of the Code of Criminal Procedure; the question submitted being whether "Harry K. Thaw is in a state of idiocy, imbecility, lunacy or insanity, so as to be incapable of rightly understanding his own condition, the nature of the charges against him, and of conducting his defense in a rational manner." The commissioners answered this question in the negative. The trial thereupon proceeded, and the jury disagreed. On January 6, 1908, the prisoner was again placed on trial, and through his counsel amended his former plea of

"Not guilty" to "Not guilty on the ground of insanity at the time of the commission of the offense charged in the indictment," upon which ground the jury rendered a verdict of not guilty. Upon the rendition of judgment thereon the learned trial justice said:

"The jury having found a verdict by which the prisoner is found to have been insane at the time of the commission of the acts charged in this indictment, an obligation now devolves upon the court to discharge his duty under the law. The testimony in this case so far as the jury have found testimony of insanity or could have found testimony of insanity is testimony of manic-depressive insanity as testified to by the experts as well as by Dr. Wells. That testimony has been based upon prior outbreaks upon the part of the defendant as testified to by the nurse in Monte Carlo, by Dr. Wells, by Dr. Bailey, by Dr. Burton-Browne, and the other witnesses in the case. It appears from the testimony that the recurrence of these attacks is reasonably if not absolutely certain; that the period of recurrence is incapable of being estimated or even guessed at by human experience, judgment or foresight, and nobody has testified in this case that there is any possibility of cure from the condition of manic-depressive insanity. It furthermore appears that in the maniacal form of manic-depressive insanity in its aggravated forms there is danger of assaults or murders being committed by the person who is troubled or afflicted by this ailment. In the repressive state of this form of the malady it appears from the testimony that there is danger that a person so afflicted will commit suicide. Upon this testimony in this case, apart from any other considerations that might recommend themselves to the court, the court is satisfied that the enlargement of the defendant would be dangerous to the public safety, and the impressions of the court are very strong as to the duty devolving upon its conscience to see to it that the defendant is not now discharged. The court therefore orders and determines as follows: The defendant for his trial on the indictment for murder herein having been acquitted by the jury on the ground of insanity, and the court being certified of the fact of the defendant being in custody, and the court deeming his discharge at this time dangerous to the public safety, it is ordered that the said Harry K. Thaw be detained in safe custody and be sent to the Matteawan State Hospital, there to be kept in said hospital until thence discharged by due course of law."

A formal order was accordingly entered, and the prisoner delivered to the superintendent of said hospital. This procedure was taken under the provisions of section 454 of the Code of Criminal Procedure.

On April 25, 1908, a writ of habeas corpus issued, and Thaw was produced at a Special Term, on May 4, 1908. The issues raised in that proceeding were whether section 454 of the Code of Criminal Procedure was constitutional, and whether Thaw was then sane or insane. The Special Term proceeded, without objection, to try the sole issue of fact as to whether or not the prisoner was then sane or insane. The issues were determined adversely to him, and on June 27th a final order was entered dismissing the writ, and remanding him back to the custody of the superintendent of the Matteawan State Hospital. In his findings and opinion the learned court says:

"I am satisfied from the evidence adduced before me that the mental condition of Harry K. Thaw has not changed, and I find that he is now insane, and that it is so manifest as to make it unsafe for him to be at large."

On June 26, 1908, another writ of habeas corpus was allowed by another justice, returnable June 29th. Upon the return day the relator in behalf of Thaw moved for a jury trial, first, as matter of right; and, second, as matter of judicial discretion, both of which motions were denied. He then moved for his discharge upon several grounds

involving the constitutionality of section 454 of the Code of Criminal Procedure, and the validity of the original order of commitment, which motion was denied. Exceptions were taken to each of these rulings. The record shows that the learned justice at Special Term ruled that the issue of fact of whether or not the relator was sane was before him for trial, and announced that he would lay aside all other business and hear the evidence upon that issue at such time as counsel could agree upon. In answer to his inquiry, "Have you any evidence to offer in behalf of the prisoner or relator upon that issue?" counsel for the relator replied, "We desire to stand upon our points of law and upon the constitutional points raised," to which the court responded:

"I have already held that the burden of proof upon the issue of the present sanity or insanity rests upon the prisoner, or those who appear in his behalf, that I am bound here to take the verdict of the jury which found him insane as true, and that the commitment of Mr. Justice Dowling is well made. I have overruled the objections upon constitutional grounds which have been presented, and, no evidence being offered, therefore I have but one thing to do; that is, to dismiss the proceedings and remand the prisoner to the Matteawan State Hospital."

From the order accordingly entered this appeal is taken, and three questions are presented for our consideration and determination:

First. Is section 454 of the Code of Criminal Procedure constitutional?

Second. Was the original commitment void, as being an indefinite sentence amounting in reality to perpetual imprisonment?

Third. Did the Special Term err in denying the relator's motion for a trial by jury, either as matter of right or of discretion?

Upon the first and second questions the relator's contention is based upon the assumption that a commitment under this section must rest upon the presumption that the insanity of the defendant existing at the time of the commission of the crime continued down to the time of the commitment, and that the Legislature cannot constitutionally empower the court to act upon such a presumption; that it authorizes the commitment of a defendant acquitted of the crime for which he has been tried to a state lunatic asylum, and provides no way in which he can be discharged other than one dependent upon the volition of the superintendent of such asylum; and that it makes no provision for notice to the defendant, and an opportunity to be heard, upon the question of his mental condition at the time the commitment is made. These contentions are based, I think, upon erroneous assumptions of the purpose and legal effect of the section, and give no consideration to the police power of the state and the manner of its exercise, or to the evidence upon which Mr. Justice Dowling acted in committing Thaw to the state hospital. The jurisdiction of the state is inherent over a person deprived of his mental faculties. It is its duty to protect the public as well as the unfortunate himself, from the danger incident to his disordered mental condition and insane acts, and it has the authority under its police power to act summarily in so doing. The discharge of this duty is accomplished in the case of a lunatic not charged with crime under the provisions of the insanity law, authorizing summary commitment to an insane asylum by a judge upon the

certificate of two medical examiners of existing insanity, and in criminal cases by the provisions of section 454 of the Code of Criminal Procedure, authorizing a trial justice before whom a prisoner has been tried for a crime and acquitted by the jury upon the ground of his insanity at the time the crime was committed, if he deems discharge dangerous to the public peace or safety, to summarily commit the defendant to the state lunatic asylum, if he be then in custody. Both are temporary expedients, exercised for the purpose of discharging the duty the state owes the public of protection from the danger incident to permitting freedom to a person mentally deranged. The same principles of law are applicable in the one case as in the other, the same objects are accomplished, and the same results obtained. If the statute under the provisions of which a lunatic is by a civil proceeding temporarily restrained of his liberty with its prescribed summary procedure is constitutional—which cannot be seriously questioned—the statute under which a person charged with crime who is acquitted because of insanity at the time the crime was committed may be summarily deprived of his liberty for the protection of the public, while his insanity and dangerous proclivities continue, is constitutional. In other words, if the state has the authority and legal right to summarily deprive an alleged insane person not charged with crime of his liberty temporarily upon evidence contained in the certificates of two medical examiners in the discharge of its duty to protect the public from the danger liable to result from his disordered and insane acts, it is charged with the same duty, and has the same authority and legal right (upon sworn testimony received upon the trial in the presence of the lunatic and his representatives, which it is his right to controvert if not true), to act summarily in depriving the defendant of his liberty temporarily for the protection of the public.

This question in the case of an alleged lunatic not charged with crime has been very recently considered by the Court of Appeals in Sporza v. German Savings Bank, 192 N. Y. 8, 84 N. E. 406, in which Judge Haight and Judge Willard Bartlett wrote exhaustive opinions. Judge Haight, referring to former procedure, says:

"It was common practice for the relatives and next of kin of persons who had become insane, if violent, to restrain them and place them in some retreat or institution for their care and medical treatment. The writ of habeas corpus was always available to inquire into the cause of such detention and to release such persons in case they were found sane; but, if insane, their detention was sanctioned under the police power of the state on account of the necessity of protecting them and the public from their disordered minds and insane acts."

He considers at length the jurisdiction possessed by the state over lunatics, and the conclusion is reached that the summary methods of their commitment are constitutional and valid. Judge Bartlett says:

"In considering the question whether a finding of incompetency by a jury is a condition precedent to the appointment of a committee, it is important to distinguish between proceedings having this end in view and proceedings instituted in the exercise of the police power for the temporary restraint of an insane person prior to the appointment of any committee. It is essential, of course, not only for the welfare of incompetent persons themselves, but for the protection of their relatives and the community at large, that authority should

exist somewhere to restrain those manifesting evidence of insanity, to the end that they may be properly treated for the purpose of effecting a cure and to protect those who may be endangered by violence at their hands. At common law any one, even though not a relative, might interfere to restrain an insane person who was dangerous to himself or others. A dangerous maniac might always be restrained temporarily. * * , * The provisions of our insanity law relating to the commitment of alleged incompetent persons upon medical certificates and similar statutory proceedings generally are designed to effect the same object under legal sanction as was accomplished at common law by the interference of private persons to restrain a lunatic in order to prevent him from doing harm to himself or others. To this end persons alleged to be insane may be committed to institutions for the custody and treatment of such patients upon an order made by a justice of the Supreme Court or other judge of a court of record. Such commitment is based upon an order 'adjudging such person to be insane upon a certificate of lunacy made by two qualified medical examiners in lunacy.' Laws 1896, p. 491, c. 545, § 60. * * * The proceedings thus provided for by the insanity law are in no wise designed as a substitute for those upon an inquisition de lunatico inquirendo. The purposes of the insanity law are protective merely, although an order for a commitment thereunder is described as 'adjudging such person to be insane.' The order is not strictly speaking a judgment at all, for it does not affect the status of the person alleged to be insane. This has been held in regard to a similar statute in Massachusetts, where it was said: 'The order of commitment settles nothing finally or conclusively against the person committed. It does not take from him the care or control of his property. It is not equivalent to the appointment of a guardian over him. He is entitled as a matter of right to institute judicial proceedings under the statutes ·to determine the necessity and propriety of his confinement.' Matter of Dowdell, 169 Mass. 387, 47 N. E. 1033, 61 Am. St. Rep. 290. Notwithstanding a commitment·under the insanity law, a person thus committed remains liable to service of civil process (Code Civ. Proc. § 427), and, until a committee has lawfully been appointed for him, his legal right to control his property remains unaffected. The so-called adjudication made upon the certificate of the medical examiners in lunacy merely affords judicial warrant for the detention and treatment of the alleged incompetent in a state hospital or other institution licensed by the state for the care and treatment of the insane."

That the commitment of Thaw was essentially temporary cannot be seriously questioned. His detention under its provisions was to continue until he should become sane, for the time being, awaiting a contingency, to wit, the restoration to sanity. Other statutory provisions were amply sufficient to procure his release and discharge in the event that he became sane. Under section 2015 of the Code of Civil Procedure he (or his friends acting for him and in his behalf) was at all times entitled to a writ of habeas corpus to determine the legality of his detention, and, upon establishing in such proceeding his then sanity, he was entitled to be discharged. He could not be detained a moment after establishing his restoration to sanity. By section 74 of the insanity law the lunacy commission is authorized to discharge any patient improperly detained in any state institution. The detention of Thaw, if sane, would have been improper, and would have conferred jurisdiction upon the commission to act. This section also provides that:

"A patient, held upon an order of a court or judge having criminal jurisdiction, in an action or proceeding arising from a criminal offense, may be discharged upon the superintendent's certificate of recovery, approved by any such court or judge."

While it is true that Thaw is not given the right of appeal from the final order committing him, which under the provisions of section 60 of the insanity law is given a lunatic committed under the provisions of that statute, such appeal was not at common law, and is not now, a necessary element of due process of law. It is wholly within the discretion of the state to allow or not to allow such a review. McKane v. Durston, 153 U. S. 684, 14 Sup. Ct. 913, 38 L. Ed. 867. It is clearly apparent in the light of the provisions authorizing the summary commitment of an ordinary lunatic, and the summary commitment of a defendant in a criminal proceeding, that it was the legislative intent to authorize a proceeding under which the same summary commitment of an insane defendant acquitted in a criminal case should be available. Each is committed upon the order of a judge in a judicial proceeding acting in the one case upon certificates of medical examiners, and in the other upon evidence taken in open court, during the progress of the trial, resulting in the acquittal of the defendant because of insanity existing at the time of the commission of the crime, and I know of no reason why the state may not confine such a person while his condition continues. Neither case requires the intervention of a jury to constitute due process of law. The statutes of this state afforded Thaw a simple and ready means of release available at any time when he could establish his restoration to reason, which differentiates the case at bar from the Michigan and North Carolina cases cited by the appellant, in which states no adequate method was provided for the release of a confined insane person after restoration to reason, which it was held denied, and did not afford to such person due process of law. No such obstacles exist in this state. It is contended that the word "they" in the section under consideration relates and refers to the jury, and not to the court, evidencing the intention of the Legislature that the court should be without power to commit, unless the jury certified that they deemed discharge dangerous; from which it would follow in the case at bar that, the jury not having so certified, the court was without jurisdiction to commit. This section was adopted at a time when the former court of oyer and terminer—composed of three—was in existence, and operative for years before the trial of Thaw. He interposed the defense of insanity, and was chargeable with the knowledge that under its provisions, if acquitted on the ground of insanity, he could be committed. It was competent for the trial court to receive evidence of his mental condition at the time of the trial. People v. Hoch, 150 N. Y. 291, 44 N. E. 976; People v. Koerner, 117 App. Div. 40, 102 N. Y. Supp. 93. Such evidence was received, and the relator had both the right and opportunity to rebut it. The record before us does not contain the testimony given upon the trial, and it is impossible for us to say that the learned trial justice did not base his conclusion upon the evidence of witnesses produced by Thaw as to the type of insanity he was suffering from at the time of the commission of the crime, as well as upon the evidence given by the people. His language indicates this, and the presumption obtains, in the absence of the evidence, that it was sufficient to warrant the conclusion reached. It seems to me that the provisions of section

454 must be held to have operated as notice to Thaw that his sanity at the time of his trial was open for investigation, and that it would necessarily be investigated in the event of acquittal upon that ground. It was investigated; both sides giving testimony. No request was made by Thaw or in his behalf to be permitted to give evidence upon his present mental condition, and no question was raised as to the power of the court to exercise the authority vested by section 454, which constituted a waiver of the right to a trial, either by jury or by the court, of the specific question of present insanity existing at that time. Sporza v. German National Bank, supra. In addition to the evidence, there was before the court the presumption of a continuation of the insanity established as theretofore existing by the defendant himself. I think these facts sufficient to establish notice and opportunity to be heard to the extent of meeting the constitutional requirement of due process of law, if such notice and opportunity are required in a summary proceeding of this character, which, in view of the conclusion reached, I do not deem it necessary to consider.

I do not overlook the contention of the learned counsel for the state that the custody of Thaw is under the final order of the justice in the first habeas corpus proceedings, which it is claimed superseded the original commitment, thus eliminating from the case the necessity of our considering the questions raised by the appellant which are based upon the original commitment. Without determining the question presented by this contention, I have regarded it advisable to consider the detention of Thaw as being under the original order and commitment, and to give due consideration to such questions arising thereunder as are brought to our attention by the learned counsel for the appellant.

The relator's exceptions to the refusal of the Special Term to discharge Thaw upon the grounds presented to that court do not present reversible error. Upon his trial Thaw had established his insanity at the time the crime was committed. It is presumed to continue until the contrary is shown, which in this case has not been done. His condition had led to one murder, and it cannot be said that the duty devolving upon the court to safeguard the public by the detention of the prisoner under the provisions of section 454 of the Code of Criminal Procedure was improperly exercised. The order was a valid adjudication of his then insanity to an extent rendering his liberty dangerous to the public. People ex rel. Morrell v. Dold, 189 N. Y. 546, 82 N. E. 1131, cited with approval in the Sporza Case, supra. It was the right of the prisoner at any time thereafter, however, to allege his restoration to reason and consequent sanity, and, if such allegation was denied, to demand that the issue be tried, and to enforce this right he and his friends had at their command the writ of habeas corpus.

I am unable to find any authority under which Thaw was entitled to have the question of fact as to his sanity or insanity tried by the jury as a matter of right. The discretion of the learned justice at Special Term was properly exercised, and it follows that the order must be affirmed.

HIRSCHBERG, P. J., concurs.

GAYNOR, J. (dissenting).   Section 454 of the Code of Criminal Procedure is void for being violative of the constitutional prohibitions against depriving any person of "life, liberty or property without due process of law."  Const. U. S. art. 14;  Const. N. Y. art. 1, § 6.  It provides that if the defendant be acquitted on the ground of insanity in any case, i. e., at the time the offense was committed, and is in custody, the trial court must, if it "deem his discharge dangerous to the public peace or safety, order him to be committed to the state lunatic asylum, until he becomes sane."   No hearing is required in respect of his sanity.  The commitment prescribed is final and permanent instead of only temporary for the purpose of a hearing or trial.  The requirement is that he be committed "until he becomes sane," thus allowing him to be treated as insane in the discretion of the trial court without giving him opportunity to be heard on the question of his present sanity.

It is not disputed that alleged lunatics, the same as alleged criminals, may be temporarily committed without a hearing lawfully in the discretion of courts and judges, i. e., until their case can be heard in conformity with the requirement of due process of law;  but they may not be committed permanently, any more than alleged criminals, without a hearing of a judicial nature on notice, which, and nothing short of which, is due process of law;  and any statute permitting the like is void.  This statute prescribes no notice or hearing, and none was given or had.  This latter is unimportant, however, for the test of the validity of the statute is not what was done, but what may be done under it.  All of the cases now to be cited decide the general principle, and several of them are still more in point, as they deal with statutes the same or similar to the one now in question.  Stuart v. Palmer, 74 N. Y 183, 30 Am. Rep. 289;  Matter of Kenny, 23 Misc. Rep. 9, 49 N. Y. Supp. 1037;  Hagar v. District No. 108, 111 U. S. 701, 708, 4 Sup. Ct. 663, 28 L. Ed. 569;  Simon v. Craft, 182 U. S. 427, 21 Sup. Ct. 836, 45 L. Ed. 1165;  People ex rel. v. St. Saviour's Sanitarium, 34 App. Div. 363, 56 N. Y. Supp. 431;  Underwood v. People, 32 Mich. 1, 20 Am. Rep. 633;  Re Boyett, 136 N. C. 415, 48 S. E. 789, 67 L. R. A. 972, 103 Am. St. Rep. 944;  Matter of Lambert, 134 Cal. 626, 66 Pac. 851, 55 L. R. A. 856, 86 Am. St. Rep. 296;  State ex rel. v. Billings, 55 Minn. 467, 57 N. W. 206, 794, 43 Am. St. Rep. 525;  Brown v. Urquhart (C. C.) 139 Fed. 846;  City of Portland v. City of Bangor, 65 Me. 120, 20 Am. Rep. 681;  Chase v. Hathaway, 14 Mass. 222;  Matter of Blewitt, 131 N. Y. 545, 30 N. E. 587.  The decision to the contrary in Ex parte Brown, 39 Wash. 160, 81 Pac. 552, 109 Am. St. Rep. 853, is disapproved by the learned reporter's note in another report of that case.  1 L. R. A. (N. S.) 540.

It suffices to say of the Massachusetts case of Gleason v. Inhabitants of West Boylston, 136 Mass. 489, that the point now up was not there raised or considered at all, much less decided.  The statute in that state is that on a verdict of acquittal of homicide on the ground of insanity the defendant shall be committed by the trial court to a state lunatic asylum for life, no discretion whatever being given to the court in the matter;  and then the Governor and Council are given

power to discharge him whenever it appears that may be done without danger to others. The only question in the Gleason Case was what township or locality was chargeable with the expense of keep of a person so committed, and all that was said was on the unquestioned assumption that a commitment under the statute was valid.

If legislative power exists to qualify the defense of insanity in homicide cases so that a verdict of acquittal on that ground shall be a qualified acquittal only, not entitling the defendant to go free, but on which he shall be committed for life, or for a less time, we have no such statute. Under ours, which relates to indictments for all crimes alike, the acquittal is complete and unqualified. The trial court is not required by it to commit the defendant on or by virtue of the verdict, but is only given power to commit him after the verdict if he be then insane, according to its judgment and discretion, but only if he be in custody; and is permitted by the statute to exercise such judgment and discretion without a hearing. It is the same as though the statute gave such power to some other court or magistrate on the defendant's acquittal. The order of commitment does not follow and is not made on the verdict, but on the judicial conclusion made afterwards that the defendant is not only a lunatic but a dangerous one at the time of his acquittal, and such conclusion is not permissible except on due process of law.

But, it is asked, if the Legislature had the power to enact that on a verdict of acquittal on the ground of insanity at the time the homicide was committed, the defendant should be committed by the trial judge in every case, simply on the verdict, how is the defendant injured by a statute permitting him to be committed only if the trial court should in his discretion deem him insane at the time of acquittal? The question is scarcely plausible, and we do not need to grope for an answer. If the Legislature wanted a defendant to be committed simply on such verdict of acquittal, it would have so enacted. But it did not want that, but only that he should be committed if insane at the time of acquittal, and not even then unless he should be dangerous to the public peace or safety, and it delegated the decision or finding of that fact to the trial court after the verdict; and the statute is void because it permits it to do so without giving the defendant a hearing. There are many things that the Legislature may do, as matter in its Legislative jurisdiction and capacity, but the doing of which, if delegated by it to any officer or tribunal as a matter of judgment and discretion, becomes judicial, and may only be done by such officer or tribunal by due process of law; as, for instance, is the familiar and often applied rule in the matter of taxation and assessment. The Legislature may apportion and cast a tax or assessment, as a matter of legislation, but if it delegate the doing of it, the official, board or tribunal to whom it delegates it can act only on due process of law, i. e., after a hearing on notice. The Taxing Power, etc., 42 Alb. Law J. 64, 68.

The contention that the trial of the defendant's plea of insanity at the time he committed the offense was a trial of the question of and established his present insanity, by aid of the presumption of the continuance of insanity, once it be established as of a given time (Cook v Cook, 53 Barb. 180), is fallacious. While such presumption of contin-

uance was evidence of present insanity, it was not conclusive evidence. It is only a presumption of fact, and the defendant was entitled to opportunity to rebut it like any other evidence. Such a presumption might suffice as a foundation for a statute to temporarily commit him to give him a hearing, but not for a statute to permanently commit him without a hearing. There may also have been evidence given on the trial of the indictment tending to prove that the defendant was then insane; but that would leave us, at most, with the same case still, viz., with evidence which the defendant was entitled to opportunity to rebut. The issue of insanity on the trial was only whether the defendant was insane at the time he committed the offense, and that is all that the verdict could establish. The notion that he was also at the same time perplexed and in jeopardy with an issue of his present sanity, of the trial of which the said statute in and of itself gave him due notice, is without foundation. He was not in the evil case of being tried at the same time on an issue of his present sanity before the judge and of his past sanity before the jury. The only notice the statute gave him was that if he should be acquitted the trial court might summarily commit him as a mere matter of discretion, and sua sponte, not as an alleged lunatic and for the purpose of a hearing, but as a lunatic and "until he becomes sane."

To say that since he is not remediless, that as he may resort to the writ of habeas corpus or some other means of a hearing to establish his sanity and regain his liberty, he is not deprived of due process of law, is to miss the purpose of that safeguard, with all due respect to judicial opinions which suggest the thing. It requires that a hearing be given before a permanent judgment or order depriving one of his liberty, and does not intend the hearing which he may afterwards be able to get by dint of seeking relief against his unlawful commitment. A principal office of the writ is to get people out who have been committed without due process of law, and on that ground.

While the decision in the recent case of Sporza v. German Savings Bank, 192 N. Y. 8, 84 N. E. 406, is not in point, it is instructive by analogy as showing the policy in this state of careful application of the constitutional provisions for the protection of liberty and property to alleged incompetents. All of the judges there agreed that an alleged incompetent had the right to have the question of his incompetency not only tried, but tried by a jury, before a committee of his person or of his property may be appointed.

And the provisions of our insanity law for the commitment and custody of lunatics (chapter 545, p. 1471, Laws 1896, a codification of former statutes) shows the same care to preserve the benefit of the said constitutional safeguard. By them a judge of a court of record is empowered to commit an alleged lunatic to a lunatic asylum on the certificate of two physicians, medical examiners in lunacy, with or without notice to the lunatic, according to his condition, or the urgency of the case. But the alleged lunatic, or any friend of his, is given by them the right and opportunity in the same proceeding to have a jury trial of his sanity forthwith after the making of the order of commitment, or at any time within 10 days. No new proceeding has to be originated. In that way the requisite of a hearing on notice, i. e., of due process

of law, is provided for; and such notice is also requisite under the provisions of the Code of Civil Procedure for the appointment of a committee. Matter of Blewitt, 131 N. Y. 541, 30 N. E. 587. But the commitment provided for by the statute here in question is not under the insanity law, and the said provisions of that law do not apply to the case of one so committed.

The claim of the relator that he cannot be permanently committed as a lunatic without a jury trial is well taken only if the said statute under which he was committed is void. In that case he could be committed and detained only under the insanity law, there being no other way provided by law; and that, as we have seen, gives him the right to a jury trial.

Under a former writ of habeas corpus a hearing was had on the question of this relator's sanity before the judge who issued it, after his claim that the said statute under which he was committed was void had been overruled. It was had on the theory of the learned judge that the relator had been lawfully adjudged a lunatic and committed, and if that were so would have been regular. But that not being the case, the hearing was not permissible, and cannot supersede or take the place of the trial by jury which the relator was entitled to as a prerequisite to his permanent commitment. The proceedings and safeguards prescribed by the insanity law were the only course open against the relator from the beginning. He should have been committed in the way prescribed by it or not at all.

The order should be reversed and the relator discharged, unless within five days he be committed under the insanity law.