PEOPLE ex rel. THAW v. LAMB, Superintendent of Matteawan State Hospital.

(Supreme Court, Special Term, Westchester County. August, 1909.)

1. INSANE PERSONS (§ 86*)—COMMITMENT OF ACCUSED ACQUITTED ON GROUND OF INSANITY.

Code Cr. Proc. § 454, provides that when the defense is insanity, if the jury acquit accused on that ground, they shall so state in their verdict, whereupon the court, if accused is in custody, and his discharge is deemed dangerous to the public peace or safety, must commit him to the state lunatic asylum until he becomes sane. *Held* that, where accused was acquitted of murder in the first degree because of alleged insanity, the court had power to commit him to the insane hospital without further hearing to determine his insanity.

[Ed. Note.—For other cases, see Insane Persons, Cent. Dig. § 149; Dec. Dig. § 86.*]

2 CRIMINAL LAW (§ 625*)—DEFENSES—INSANITY—PRELIMINARY INVESTIGATION —EFFECT.

Where accused pleaded insanity in defense of a prosecution for murder, the determination by a commission, appointed before trial, that he was sufficiently sane to understand the nature of the charges against him and conduct his defense in a rational manner, was not an adjudication as to the prisoner's then condition.

[Ed. Note.—For other cases, see Criminal Law, Dec. Dig. § 625.*]

3. JUDGMENT (§ 559*)—ACQUITTAL BECAUSE OF INSANITY—RES JUDICATA.

A verdict acquitting accused of murder because of insanity was res judicata between the people and accused that he was insane at the time of the commission of the homicide to a degree that he did not then know the nature and quality of the homicidal act, or that it was wrong.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1077, 1078; Dec. Dig. § 559.*]

4. HABEAS CORPUS (§ 85*)—RESTORATION TO SANITY—EVIDENCE.

Where, in a prosecution for homicide, the jury found accused insane at the time it was committed, and his insanity was of such a character that recovery was unlikely, it would be presumed that it continued to exist, and hence the burden of proof on habeas corpus for discharge was on

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

him to show that he had become sane to a degree that his enlargement would be without menace to the public peace and safety.

[Ed. Note.—For other cases, see Habeas Corpus, Cent. Dig. § 78; Dec. Dig. § 85.*]

5. HABEAS CORPUS (§ 120*)—RES JUDICATA.
Denial of a prior writ of habeas corpus, sought to enlarge a person acquitted of murder because of insanity, on the ground that he was then sane, was not res judicata on the issue of the petitioner's then insanity on the subsequent hearing of a new writ for similar relief.

[Ed. Note.—For other cases, see Habeas Corpus, Cent. Dig. § 121; Dec. Dig. § 120.*]

6. HABEAS CORPUS (§ 85*)—EVIDENCE.
On habeas corpus to obtain the enlargement of an alleged insane person from confinement, on the ground that he had become sane, evidence *held* insufficient to establish that he had so far recovered that his enlargement would not be a menace to the public.

[Ed. Note.—For other cases, see Habeas Corpus, Cent. Dig. § 77; Dec. Dig. § 85.*]

7. INSANE PERSONS (§ 50*)—CONFINEMENT IN ASYLUM—TREATMENT.
Where accused was acquitted of murder because of insanity, and was thereupon committed to an asylum, he was not in the hospital as a criminal to undergo punishment, but should be treated with such consideration and allowed such privileges as were not clearly incompatible with due discipline, with the hope that he might ultimately recover.

[Ed. Note.—For other cases, see Insane Persons, Dec. Dig. § 50.*]

Habeas corpus by the State, on relation of Mary C. Thaw, against Robert B. Lamb, as Superintendent of Matteawan State Hospital, for the enlargement of Harry K. Thaw, an alleged insane person, from confinement at such hospital. Application denied.

Charles Morschauser, for relator and prisoner.

William Travers Jerome, Dist. Atty., of New York County, Roger Clark, Deputy Atty. Gen., John E. Mack, Dist. Atty. of Dutchess County, and Francis A. Winslow, Dist. Atty. of Westchester County, for defendant.

MILLS, J. This is a proceeding by writ of habeas corpus to secure the discharge of Harry K. Thaw from the Matteawan State Hospital, to which he was committed by Mr. Justice Dowling on the 1st day of February, 1908, upon the rendition of the verdict acquitting him, upon the ground of insanity, at his trial on an indictment charging him with the crime of murder in the first degree in having, on the 25th of June, 1906, killed Stanford White in the city and county of New York.

The history of the Thaw Case prior to this proceeding is notorious and need not be here recited. Its details may be found set forth in the opinion written by Mr. Justice Morschauser in a prior like proceeding at the Dutchess Special Term in May, 1908, in the case of People ex rel. Peabody v. Baker, 59 Misc. Rep. 359, 110 N. Y. Supp. 848; and also in the opinion recently written by Mr. Justice Rich in June last at the Appellate Division of this department, not yet officially reported, upon an appeal to that court from an order made here, in another like proceeding, entitled People ex rel. Peabody v. Chanler (Sup.) 117 N. Y. Supp. 322, dismissing the writ and remanding the prisoner.

The return filed by the defendant pleads, as the ground of Thaw's detention, said commitment, and alleges:

"That the said Harry K. Thaw is now of unsound mind, and that he could not now be released from custody without danger to the public peace or safety."

When produced upon the return the prisoner presented to the court his answer, duly verified by him, wherein he denied the allegation in his return as to his present insanity and affirmatively alleged that at the time of the issuing of the writ herein "he was sane and of sound mind." The answer further denies the validity of the original commitment, and, respecting the same, alleges:

"That the court had no power or jurisdiction to make or issue the same, and that the relator (meaning the said Thaw) never was tried for his sanity, upon which a commitment could issue."

This latter contention was expressly made and overruled in the former proceeding before this court, and the ruling here thereon was affirmed by the Appellate Division upon the appeal above recited, and therefore that claim will not herein be further considered. The issue thus joined by the return and answer is that of the present sanity of Thaw, or, in other words, whether or not he has now become sane to the degree that his enlargement would be without danger to the public peace or safety. By the terms of section 454 of the Code of Criminal Procedure, by authority of which such commitment was made, the term of his imprisonment or detention thereunder was only "until he becomes sane"; so that, if he has now attained the state of sanity to the degree mentioned, the term of his commitment has expired and he is entitled to be discharged therefrom.

The statute (section 2039 of the Code of Civil Procedure) provides that, upon the joinder of issue in such a proceeding:

"The court or judge must proceed in a summary way to hear the evidence produced in support of or against the imprisonment or detention," etc.

In obedience to such command this court proceeded with all possible despatch to try such issue. Seventy-seven witnesses have been examined orally, and the testimony of 49 other witnesses, given at some one or more of the prior trials or investigations, has been read from the minutes thereof, under the stipulation of counsel that it shall have here the same effect as though actually given orally by the several witnesses. Therefore this court has now before it the testimony of 126 persons all bearing more or less materially upon the question to be determined. Whatever may be true of former trials or investigations, it seems plain that all available material evidence is now before the court to aid in its determination.

There have been four previous judicial or quasi judicial determinations of the question of the prisoner's insanity at various times and to various degrees. At the threshold of the consideration of the case here the question of law therefore arises: What, in this proceeding, is the effect of those prior determinations, each and all? At all of them the parties before the court were substantially the same as those before this court now, viz., Thaw on the one side, and, upon the other, the people or their representative, for example, this defendant, as the

superintendent of their hospital. Ordinarily the determination of a court or judge within its or his jurisdiction and upon the merits is conclusive, at least as to the fact determined, in all subsequent judicial proceedings between the same parties before the same or any other judicial tribunal.

The first of these four prior determinations was the report of the commission appointed by Mr. Justice Fitzgerald during the first murder trial to inquire and advise the court as to the prisoner's then sanity. Such commission, on the 4th day of April, 1907, after due inquiry by the taking of evidence and by personal view and interrogation of the prisoner, reported that at the time of their examination, then just completed:

"The said Harry K. Thaw was and is sane and was and is not in a state of idiocy, imbecility, lunacy, or insanity so as to be incapable of understanding his own condition, the nature of the charges against him, and of conducting his defense in a rational manner."

Under the statute such report was for a temporary purpose merely— that is, to determine whether or not the trial should proceed—and it cannot here be regarded as an adjudication even as to the prisoner's then present condition. Moreover, it is quite evident from the testimony of the experts that one afflicted with certain forms of insanity might still be capable of understanding "the nature of the charges against him and of conducting his defense in a rational manner."

The second of the four prior determinations was the verdict of the jury upon the second murder trial acquitting the prisoner upon the ground of insanity. It seems plain that such verdict must be regarded here as res adjudicata between the people and any of their representatives acting in their interest, and the prisoner here, to the effect that he was, at the time of the commission of the homicide, insane to the degree that he did not then know the nature and quality of the homicidal act he was committing, or did not know that such act was wrong. It seems equally clear that the natural presumption of fact follows that such condition of insanity has continued to the present time. The effect of such presumption is to cast upon the prisoner here the burden of proving that since the commission of the homicide he has become sane to the degree that it is reasonably certain that his enlargement now will be without menace to the public peace or safety. Where insanity has gone so far as actually to take human life, no sensible person will be satisfied with evidence of recovery which does not attain to the degree of reasonable certainty. At the beginning of the trial the court here so ruled, both as to the burden of proof and the degree of requisite evidence. Such ruling was accepted by all the counsel without objection or demur.

The third of the four prior determinations was the decision of Mr. Justice Morschauser at the Dutchess Special Term, May, 1908, in the former like proceeding there. In that decision the court held that the prisoner was then still insane. Upon general principles, without special examination of the authorities, a lawyer would naturally suppose that such decision would here be res adjudicata as to the fact of insanity at that time. The situation as to it seems to present all the elements requisite for the application of that doctrine. It appears, how-

ever, that the law of this state has been definitely settled to the contrary. People ex rel. Lawrence v. Brady, 56 N. Y. 182, 191, 192; Matter of Quinn (2d Dept.) 2 App. Div. 103, 104, 37 N. Y. Supp. 534; People ex rel. Ammon v. Johnson (2d Dept.) 114 App. Div. 876, 877, 100 N. Y. Supp. 256.

In the Lawrence Case, just cited, there had been two prior like proceedings by writ of habeas corpus, in each of which the court had dismissed the writ. In the proceeding under the third writ, which was the case decided by the Court of Appeals, the return pleaded the two prior proceedings and the decisions therein as a bar. All matters affecting the merits existed prior to the first proceeding and determination. Respecting the claim of res adjudicata, the opinion of the Court of Appeals said:

"We are of opinion that the previous adjudications in proceedings on habeas corpus are no answer to a new writ issued on the application of the relator. The case is not within the principle of Mercein v. People, 25 Wend. 64, 35 Am. Dec. 653, where the controversy related to the right to the custody of an infant child. In this case the relator is restrained of his liberty; and a decision under one writ, refusing to discharge him, did not bar the issuing of a second writ by another court or officer." 56 N. Y. 191, 192.

In the Quinn Case, supra, upon this question, although not directly involved, the Appellate Division of the Second Department, Mr. Justice Cullen writing, said:

"In fact it is settled law that, with the exception of a narrow class of cases, such as the custody of infants, a decision on habeas corpus does not create an estoppel even upon renewals of the writ." 2 App. Div. 104, 37 N. Y. Supp. 534.

And in the Ammon Case, supra, the same Appellate Division, Mr. Justice Woodward writing and all concurring, said:

"We shall assume without discussion that habeas corpus is the correct proceeding, and that the relator has a right to bring as many such proceedings as he may be advised are necessary to protect his legal rights"—he having brought several other prior like proceedings.

Although the decision of Mr. Justice Morschauser cannot here be given the force of an adjudication, yet it is doubtless entitled to receive great consideration as the opinion of another justice in the same district, upon a considerable part of the evidence now before the court, and as to part of the facts now to be determined, and is here freely accorded such weight.

The last of the four prior determinations was the order made by this court in October last, which, as above recited, was affirmed in the Appellate Division. In that proceeding, however, the prisoner elected to rely solely upon his legal contention that the original commitment was invalid, and no evidence upon the issue of insanity was introduced by either side; so that, as to that question, there was then no trial upon the merits, the decision of the court here resting merely upon the presumption of continuance above mentioned.

After carefully considering the mass of evidence before me and the arguments of counsel, I have reached, and here state, the following as my conclusions upon the issue of fact involved:

### First Conclusion.

The insanity with which Harry K. Thaw was afflicted on June 25, 1906, at the time he committed the homicide, was of the kind known as chronic, delusive insanity, or paranoia. This conclusion rests upon the following facts, which appear to me to be clearly proven:

There was, in his ancestral blood, a substantial but not very strong trace of insanity. By "not very strong" is meant the fact that no one of his direct ancestors was ever insane. Upon the maternal side two uncles were of unsound mind, each at least for a portion of his life; and on his father's side an aunt was at least an epileptic and perhaps insane; and some more remote relatives were undoubtedly insane, although as to them the evidence is not clear but that there had been insanity in one of their ancestral lines not common to the prisoner's own descent. As a young child he was physically weak and puny, exceedingly nervous and abnormally wakeful. Older, he was subject to violent spells, amounting almost to paroxysms of excitement, without any naturally adequate cause. He attended various schools for different periods from the age of six upwards, but made little progress in study. While at school, especially in his earlier years, he had frequent outbreaks of uncontrollable excitement, in which his facial appearance was wild and staring. When he was at the age of 10 years (he being now about 38) his own mother, respecting an attack of violence at school, wrote to the head teacher, Prof. Beck, a letter in which she expressed her apprehension "that his mind is more or less unbalanced," adding:

"Do you think there is any danger of that? The uncle to whom I refer as having become weak minded was, when a child, subject to just such outbreaks of temper, and therefore I cannot help a horrible feeling of dread."

Older, he attempted special study at Harvard, but shortly left to avoid practical expulsion. Thereafter he made two separate attempts to study law, each of which was soon abandoned. Then followed a period of some 10 years, in which he seems to have attempted no business, but to have roamed about at will. Two attacks of at least great nervous outbreak, if not actual mania, are proven, one at Monte Carlo in 1897, and another in London in 1899, each attendant upon illness. About 1901 he became enamored of a young woman, Miss Nesbit, whom he afterwards married. She was then by common reputation well known to him, the mistress, or a mistress, of Stanford White. She soon assumed that relation to Thaw, and obviously, to account to him for her former position with White, told him various wild and grossly improbable stories of the inception of that relation. Although he (Thaw) evidently was himself far from a moral man, and was then engaged or soon thereafter became engaged in practices of a perverted character, as revealed by the testimony of the Merrill woman, which, with the corroboration afforded by other evidence in the case, appears credible, he gave absolute credence to the tales told him by Miss Nesbit about White. He obtained similar information as to White's conduct with a few other young women, either directly from them or through Miss Nesbit, all of which information was of the same wild and improbable character, evidently to any normal mind grossly exaggerated. To all, however, he gave implicit belief. His mind became

absolutely possessed with those stories. He not only believed them in their entirety, but he deduced from them conclusions as to the practices of White far beyond what such belief in a normal mind would warrant. From the charges separately made by those few admittedly immoral women, he concluded that White maintained several places in New York City where he accomplished, by force or by drugs, the ruin of respectable young American girls, as it were by the wholesale. Such belief, to such extreme extent, was plainly a delusion. With it there came to his mind the conviction, also delusive in character, that he had a special mission to destroy White's practices. These delusions had become established, fixed, and systematized in his mind prior to his marriage, April 4, 1905, and so continued at least until after the homicide.

On the day of his marriage he executed his will and codicil. The provisions of the latter were the product of those delusions and plainly the work of an unsound mind. He sought strenuously to execute his mission to destroy White by attempting to institute legal proceedings against him, and to that end employed detectives and appealed for aid to public authorities; but every effort along that line proved abortive, for the simple reason, as he was clearly informed, that in no one of the alleged cases of White's criminal wrongdoing could any substantial evidence to corroborate the women claimed to have been wronged be obtained, the law, in its wisdom, based upon the general experience of. mankind, demanding imperatively some such corroborative evidence. His delusions as to the practices of White were not shaken by the failure of the investigations made by the detectives and public authorities, and his delusive belief in his special mission continued to possess his mind.

In that mental condition, at the Roof Garden he came into the presence of White doubtless unexpectedly and publicly shot him to death in a spectacular and theatrical manner. In so doing he believed that he was acting as the agent of Providence and performing a praiseworthy act like that of David in slaying Goliath, or St. George in killing the dragon. Shortly thereafter, when his prosecution was entered upon, and his counsel (Mr. Delafield, Mr. Olcott, and Ex-Governor Black), among the most reputable and able, called in reputable alienists to examine him, and, upon their report that he was insane, designed to submit him to the examination of other reputable alienists employed by the prosecution, with the view that, if the latter agreed with the former, they (the counsel) would ask the prosecuting officer to join in having Thaw committed to an asylum as insane, he at once became possessed with the belief that his counsel and alienists had entered into a conspiracy with the district attorney and certain friends of White to railroad him to Matteawan so as to avoid a trial, for the sole purpose of protecting White's memory and of saving White's associates from public exposure of their infamous practices. Such belief—that is, as to the purpose—was utterly without the least foundation and a clear delusion.

All this, according to the weight of expert testimony, is plainly the history of a paranoiac. This court concludes therefore that Thaw's insanity at the commission of the homicide was of the kind known as

paranoia, and not at all of the "brainstorm—sane half a minute before and sane half a minute after"—variety, if any such variety really exists.

The verdict of the jury was plainly warranted by the evidence, not merely as an expression of reasonable doubt, but even as an affirmative finding of the fact of insanity.

It is true that the new testimony upon this trial, introduced in behalf of the prisoner, tends to materially vary the history of his early life as above stated. I am convinced, however, that in such variance it is very largely mistaken; and that the testimony upon that point, given at the second murder trial by mother, nurse, family physician, and teachers, is the more credible. The prisoner and his family at that trial presented such evidence to the jury as true, and upon it sought and very likely secured the acquittal. In any proceeding now the court must view with close suspicion any new evidence in his behalf seeking to change the facts as proven at that trial also in his behalf.

### Second Conclusion.

Harry K. Thaw has not yet recovered from his insanity above stated and defined. This determination is made upon the following grounds:

First ground: All the experts agree that in a case of true paranoia recovery is very doubtful. Some of them testify that no case of recovery was ever known, while others state that the percentage of recovery is only from 1 to 2 per cent. The utmost suggestion was of from 8 to 10 per cent., or thereabouts, claimed to have been shown in some report by the state commission in lunacy, which report, however, was not submitted to the court. Manifestly, in view of the short or at least not long period, three years at the most, which has elapsed, there is certainly no presumption of recovery from the lapse of time alone.

Second ground: The court is disposed to pay great respect to the opinion of the hospital authorities here—of Dr. Baker, the hospital physician having had actual charge of Thaw there. All such authorities are public officers, with no conceivable motive except to do their duty. In the absence of clear contrary evidence, none such here appearing, it must be assumed that Dr. Baker has been entirely honest and sincere in his conduct and testimony. While he frankly admits that upon his own observation alone, the prisoner having, except for a short period at first, declined upon the advice of counsel to answer the doctor's questions, he (the doctor) could not decide whether or not Thaw is now insane; yet he testifies that upon his observations, with the previous history of the case as revealed at the second murder trial, he is clearly of the opinion that the prisoner is now insane to the degree that his discharge would be dangerous.

While paying this high regard to Dr. Baker, the court is by no means satisfied with the treatment which Thaw has received at Matteawan since his return there in October last after his unsuccessful attempt in the courts then to obtain his freedom. No one could help being greatly moved by the deep and manifestly unfeigned distress of the mother when, as a witness, she narrated that treatment, telling how, after his return in October last to the institution, he was refused his former comfortably furnished room, compelled nightly to undress in the ward in the presence of 50 or more unquestioned lunatics, to pass

then through the infirmary, between rows of cots with the sick in them, to his room with the bed as its sole article of furniture and remain there in darkness 10 hours from 8 p. m. In considering this narrative, doubtless allowance must be made for the effect of the mother's feelings. It must be understood that Thaw is not at the hospital as a criminal to undergo punishment. The jury, the supreme authority in the matter, has, by its verdict, declared him innocent of any crime in the matter of the homicide, and their verdict must be respected, at least by all public officials. In the hospital he must be regarded as an unfortunate person afflicted with mental derangement, there not to be punished for any crime, but solely to be cared for, protected, and guarded so that he may not injure another or himself, but always with the distinct hope that he may ultimately be cured, however great or small that hope may really be. It is well, doubtless, that care should be exercised by the authorities that Thaw be not favored because of the wealth and social position of his family. It is equally well, however, that care be exercised that he be not treated any worse upon those accounts. It may well be that this court, in the exercise of its plenary chancery powers, has the authority by order to make specific directions as to the treatment of an inmate in such an institution. However that may be, I venture to suggest to the authorities there that, when he is returned to their custody, the privileges, so called, which he was permitted to enjoy in his first three months' stay there, be restored to him, if such a procedure be not found to be clearly incompatible with due discipline; and, further, that his venerable and most estimable mother be at all times treated with the utmost possible consideration. Her sorrowful condition commands the profound sympathy of every normal mind.

Third ground: In view of leading traits of paranoia, the lay testimony given by so many entirely respectable and credible witnesses, showing rational conduct on the prisoner's part in the Tombs, at Matteawan, and in the Dutchess and Westchester county Jails, is not of commanding force. The traits here referred to are: (1) That the disease may be subject to long periods of remission; (2) that one afflicted with it can, by design, conceal his delusions for long periods, at least until a late stage of the malady; and (3) that until far advanced it may not perceptibly weaken the general mental powers, so that the mind of the person afflicted may appear normal and even bright, especially apart from matters connected with the delusions, and may, even upon the basis of the delusive beliefs, reason logically and acutely. The great mass of the lay witnesses in talking with him purposely avoided all allusion to his trouble, as they termed it; that is, the homicidal act and his delusive beliefs. Those who did with him touch upon such matters did so very lightly. Moreover, according to his own statement, he refused, by advice of counsel, to talk upon those subjects, and especially did he so refuse to Dr. Baker. However eminent the counsel who gave such advice may be, I think that the same was mistaken. Had Thaw frankly answered Dr. Baker's questions at Matteawan, it is not impossible, although improbable, that the doctor's attitude here might have been different.

The contrast between Thaw's talks with lay witnesses, upon other subjects, and his writings upon the matters affected by his delusions, is manifest and great. For example, no one can carefully read by himself, as I have done, the "instructions to Delmas," prepared by Thaw in the early part of 1907 and here in evidence, and not be convinced that the notes thereon, written by him, are the work of an unsound mind charged with the idea that the killing of White was an act of Providence and entirely praiseworthy.

Fourth ground: The testimony of the alienists called for the defendant, as to the present condition, seems to me, upon the whole, more convincing than that of those called for the prisoner. It takes fairly into account the previous history as above stated, and in the case of each witness is consistent with his own former attitude in the case. Of Thaw's experts Dr. Evans experienced great difficulty in reconciling his present opinion with his previous attitude in connection with the homicide trials, and to my mind did not entirely succeed in so doing. From Dr. Harris' cross-examination it was plain that he does not think that Thaw was ever really insane; whereas, as above shown, this court is bound here to assume that he was insane when and to the extent declared by the verdict. My mind was much impressed by the testimony of the local expert, Dr. Schmid, whose long and great practical experience in actually dealing with cases of insanity, real and suspected, whose sound conservative judgment thereon, and whose eminent candor as a witness, have long been well known to and highly appreciated by me. I have not the least doubt of the correctness of his narrative of his observations or of the sincerity of his conclusion; but upon cross-examination it appeared that he had not been furnished with the full history of the case, and, besides, he was not present in court to listen to the examination of Thaw as a witness here.

Fifth ground: Upon my own personal observation of the conduct of Thaw, his actions and speech in the courtroom, both on and off of the witness stand, I have been impressed that he is now of unsound mind. He was exceedingly nervous and very frequently interrupted his counsel with suggestions. It is not uncommon for a client at a trial to press upon his counsel suggestions as to the conduct of the case, often perhaps to the real detriment of the client's cause, and the mere doing of such a thing, of course, cannot be taken as proof of insanity; but, in a long experience in court, I have never known a client to do that nearly as much as Thaw did it here. Upon his examination it became evident, even by his own admission, that he holds his former beliefs as to the evil practices of White, just as extremely and just as strongly to-day as ever. If those beliefs constituted delusions in his mind when he committed the homicide, they are the same now. While he has now more evidence against White than he had then, it is all of the same character, and neither alone nor with what he previously had, warrants his extreme convictions. In the latter part of his examination, when he was striving mightily to defend his delusive beliefs, his facial appearance seemed to me not to be that of a sane person. For instance, when, during the last afternoon of his testimony here, he went on for 20 minutes at least in his effort to state and justify his extravagant belief as to White's conduct with a certain woman, there was

upon his face plainly to my personal view that look, perhaps indefinable in words, which marks the impress of the "mind diseased."

### Third Conclusion.

The enlargement of Harry K. Thaw now would be dangerous to the public peace and safety, and therefore cannot be permitted. This conclusion follows necessarily from the determinations above expressed.

In the work of the trial the court has been greatly aided by the clear, definite, and generally able manner in which the learned counsel upon both sides have presented the case, both in the introduction of evidence and in the final argument. The trial has been almost entirely free from technical objections, or indeed any kind of objection, and wholly free from anything in the nature of personal controversy between counsel.

Having, out of consideration for the mother's feelings, permitted her as a witness to make at will her plea for her son, and in so doing to give certain incompetent testimony which embraced criticisms of Mr. Jerome, I deem it my duty to say that those criticisms seem to me to be mistaken and unwarranted, although doubtless sincere. In the very complete record before me I find no evidence of any heartlessness or undue zeal upon his part. If he made the remark remembered by Mrs. Thaw, to the effect that he hoped her son would never be released from Matteawan, I am confident that it was made as the expression, not of a hope, but of a conviction, that he would not recover.

The writ therefore must be dismissed upon the merits, and Harry K. Thaw remanded to the custody of the defendant, whence he was produced here.