---

## Ex parte THAW.

### (District Court of New Hampshire. April 14, 1914.)

1. EXTRADITION (§ 21*)—INTERSTATE—POWERS OF FEDERAL COURTS.

   As the source of extradition power of the states is federal, and as it relates to crime only and contemplates the exercise of exceptional and arbitrary control in restraint of personal liberty, the federal Constitution and acts of Congress have reserved to the federal government, and imposed upon its courts, the very important duty of seeing that the power is exercised upon due and appropriate process, and that it shall not be extended to fields, and exercised in classes of cases, not clearly intended by the Constitution.

   [Ed. Note.—For other cases, see Extradition, Cent. Dig. § 26; Dec. Dig. § 21.*]

2. EXTRADITION (§ 34*)—QUESTIONS INVOLVED IN HABEAS CORPUS PROCEEDINGS—REQUISITES OF PAPERS.

   Under the later decisions it may be said that, as between the states, all penal offenses, misdemeanors as well as crimes, are covered by the power of extradition delegated by the federal Constitution, and the only question for a federal court in a habeas corpus proceeding is the one of due process. Under the general question of due process are the subsidiary ones whether crime is charged and described with legal certainty against a responsible person, which is a question of law, and the question of flight which is one of fact; and, in a case where there is no evidence dehors the record upon the question of flight involved, all these questions must be determined upon the face of the papers, which must show what the Constitution contemplates—a responsible person, a charge of crime, which must be supplemented by a clear and complete description of the crime, and a fleeing from justice.

   [Ed. Note.—For other cases, see Extradition, Cent. Dig. §§ 35–38; Dec. Dig. § 34.*]

3. EXTRADITION (§ 34*)—REQUISITION PAPERS—RULE OF STRICT CONSTRUCTION.

   Because extradition follows automatically and as of right, without investigation, in cases where all the contemplated elements of crime distinctly and unquestionably appear upon the face of the papers, and because extradition involves such drastic and unchallengeable power exercised at variance with common-law principles, all courts, both English and American, hold to rules of strictness in respect to the description of the crime and to rules of strict construction upon questions of intendment in respect to what is shown on the face of the papers.

   [Ed. Note.—For other cases, see Extradition, Cent. Dig. §§ 35–38; Dec. Dig. § 34.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

4. EXTRADITION (§§ 28½, 39*)—INTERSTATE—SUFFICIENCY OF REQUISITION PAPERS—"PERSON."

In order to have extradition there must be a person, a crime, and a flight, and, under a reasonable and necessary construction of the constitutional provision, the person must be a responsible person; but naming the person who is charged will be supplemented by the presumption of responsibility and will be sufficient to establish the constitutional elements, unless the description of the person and the crime for which he is sought to be extradited involves something which reasonably overthrows the essential presumption of responsibility.

[Ed. Note.—For other cases, see Extradition, Cent. Dig. §§ 31, 45, 46; Dec. Dig. §§ 28½, 39.*

For other definitions, see Words and Phrases, vol. 6, pp. 5322–5335; vol. 8, p. 7752.]

5. EXTRADITION (§ 34*)—INTERSTATE—SUFFICIENCY OF PAPERS.

When the crime alleged in the papers as the ground for extradition is a conspiracy by the person charged and others for his escape from a custody based only upon a finding of his insanity and a commitment thereon, such a finding not only overthrows the presumption of responsibility but creates the presumption that insanity continued until the escape, and this throws the question of criminal responsibility into the field of uncertainty, and the burden of proving a recovery or a lucid interval, as the case may be, rests upon the person alleging the same.

[Ed. Note.—For other cases, see Extradition, Cent. Dig. §§ 35–38; Dec. Dig. § 34.*]

6. EXTRADITION (§ 39*)—INTERSTATE—SUFFICIENCY OF PAPERS.

Uncertainty appearing upon the face of extradition papers in respect to the material element of mental condition and criminal responsibility is as fatal to the idea of the constitutional right of extradition as would be uncertainty as to a physical fact which is a necessary element of the crime sought to be described.

[Ed. Note.—For other cases, see Extradition, Cent. Dig. §§ 45, 46; Dec. Dig. § 39.*]

7. EXTRADITION (§ 28½*)—INTERSTATE—GROUNDS.

The constitutional power of interstate extradition does not extend to the return of a person fleeing from guardianship custody, based upon a decree or finding of insanity, idiocy, or infantile irresponsibility, or from process in the nature of civil process invoked for parental and protective purposes.

[Ed. Note.—For other cases, see Extradition, Cent. Dig. § 31; Dec. Dig. § 28½.*]

8. EXTRADITION (§ 30*)—INTERSTATE—GROUNDS—SUFFICIENCY OF PAPERS.

The constitutional element of flight must have some causal relation to the specific crime alleged as the ground for invoking the power of interstate extradition, and such relation is not shown where the crime charged is a conspiracy to escape from confinement in an insane asylum under a civil process, and the flight was from such institution into another state immediately following the escape. In such case the flight was clearly not from the crime or its consequences but from the incarceration and confinement.

[Ed. Note.—For other cases, see Extradition, Cent. Dig. § 32; Dec. Dig. § 30.*]

In the matter of the petition of Harry Kendall Thaw for writ of habeas corpus. Writ granted.

See, also, 209 Fed. 954.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Drew, Shurtleff, Morris & Oakes, of Lancaster, N. H., Martin, Howe & Donigan, of Concord, N. H., William A. Stone, of Pittsburg, Pa., and William M. Chase, of Concord, N. H., for petitioner.

William T. Jerome, of New York City, Franklin Kennedy, of Albany, N. Y., and Bernard Jacobs, of Lancaster, N. H., for respondent.

ALDRICH, District Judge. In this case the person sought to be returned to the demanding state of New York under the federal Constitution, which provides for extradition upon a charge of crime, is in fact a fugitive from a decree of custody under which, at the time of his flight, he was being held as an insane person; and the questions involved in his habeas corpus proceeding are entirely new to both English and Amercian jurisprudence.

The question here is not the general question whether the petitioner should be returned to New York custody, but the specific question whether the process under which he is sought to be returned is due process in the constitutional extradition sense.

The status of New York in respect to the situation is not that of a prosecutor for crime in the sole and ordinary extradition sense, because the relationship of guardian and ward is the foundation upon which the entire proceeding is based, and because, as claimed, extradition is sought, first, for punishment for the misdemeanor involved in the alleged plan of escape, and, second, for recommitment to guardianship custody at Matteawan.

This proceeding is in no sense whatever based upon the idea of recovering the person of Thaw for the purpose of punishing him for the offense of killing White, for which he was acquitted, because, as is axiomatic, and because, as expressly decided by the Appellate Division of the New York Supreme Court in Peabody v. Chanler, 133 App. Div. 159, 117 N. Y. Supp. 322, 325, which was one of the Thaw Cases, "there can be no punishment for him who has been acquitted."

So we have the case pure and simple, and that is all there is of it, of a person sought to be extradited under the Constitution because he has fled from guardianship custody based upon the verdict of a jury that he was insane. The person was committed on the ground of insanity, and was being held under the same commitment at the time of the alleged escape and flight.

The case is a novel one, and requires the utmost caution, as the power of extradition is exceptional and extremely arbitrary, and because it imposes itself upon personal liberty, and because heretofore neither in this country nor in England has extradition power been invoked for the return of a person fleeing from custody based upon such a finding of insanity and such an escape and flight.

Without elaborating upon particular reasonings and judicial decisions since extradition began, it may be said that, heretofore, no one has ever claimed that extradition operated otherwise than in the strict field of crime, where the crime is described with a particularity and legal certainty answering the requirements of criminal pleadings, and where, upon the face of the papers, there was no open question as to the criminal responsibility of the person sought to be extradited. The

proposition here is that the power of extradition should operate because, as was claimed in oral argument, contrary to what appears on the face of the papers, it can ultimately be shown in New York that the person sought to be extradited had sufficient mental appreciation to know that his escape was wrongful. Such is not only a novel proposition in the extradition sense, but is one fraught with dangerous possibilities, because if it is once established that you may extradite for crime a person who, as appears on the face of the papers, has escaped from guardianship custody based upon a finding against him as an insane person, upon the idea that the demanding state many ultimately prove him sufficiently sane to be a criminal, the principle is established that extradition may operate in the field of uncertainty, and as a result it would follow that you might extradite for crime an irresponsible infant who escaped from guardianship custody, or an idiot who escaped from a decree of custody based upon idiocy and indigency, as well as an insane person, upon the theory that you may subsequently, at some time and in some remote part of the country, prove that they had sufficient sense to know that the escape was unlawful and consequently that they were subject to extradition as criminals; and, failing ultimately to show criminal responsibility, it results that the person, though irresponsible, stands as a person extradited for crime under the power of the Constitution.

Thus in view of the large sense in which the proposition involved concerns the public, because of its possible application to children of tender years and idiots and other helpless and irresponsible persons, as well as the insane classes charged with crime, the question becomes one of far greater importance than the interests of the state of New York to have possession of this particular person, or the consequences which may come to this particular petitioner through a decision one way or the other.

It is because the question here is a new one and one which has a public phase, in the sense that it relates to a principle which, once established, will operate upon great classes of individuals, that it becomes a question of greater gravity than one which affects only the rights of the immediate parties concerned; and it was in this sense that Lord Justice Sir William Milbourne James, in Pooley v. Whetham, 15 Ch. D. 435, 440, said, in speaking of extradition and how it should operate, that the more important question was the public question, apart from the importance to the individuals concerned, and that, if the process of extradition was abused through using it for improper purposes, a party should be discharged independently of any extradition act or any other act in the world.

The practical exercise of the power of extradition having been delegated to the states under the federal Constitution and acts of Congress, the responsibility of the federal government is limited to the question whether, in a given case, the escape and flight constitutes a fleeing from justice in the constitutional and statutory extradition sense, and the further question whether the supposed crime is substantially and legally charged.

[1] As the source of extradition power of states is federal, and as it relates to crime only, and contemplates the exercise of exceptional and arbitrary control in restraint of personal liberty, the federal Constitution and acts of Congress have reserved to the federal government and imposed upon its courts the very important duty of seeing that the power is exercised upon due and appropriate process, and that it shall not be extended to fields and exercised in classes of cases not clearly intended by the Constitution.

The power of restraint of liberty and of personal delivery under extradition process is arbitrary and exceptional, because a person may be taken into custody in one jurisdiction and conveyed to another without a hearing before the Governor, and, as said in New York in a comparatively recent opinion by Mr. Justice Cullen in Corkran v. Hyatt, 172 N. Y. 176, 193, 64 N. E. 825, 830 (60 L. R. A. 774), approved by the Supreme Court, 188 U. S. 691, 23 Sup. Ct. 456, 47 L. Ed. 657):

"Unless he may review his extradition on habeas corpus, a citizen, on the fiat of an executive officer, without a hearing, may be transported a prisoner to the utmost confines of the country."

And earlier the New York Supreme Court in People v. Donohue, 84 N. Y. 438, 441, in maintaining that suitable preliminary papers were essential in extradition proceedings, and that the right of review exists when judicial investigation and the judgment of the law are invoked, said:

"To say they are not would be to disregard the law, and make the executive an autocrat."

In exercising the power of interstate extradition, states are using a federal force, and, although there has been a world of discussion as to the scope of the revisory power reserved to itself by the federal government, it may now be accepted as unquestionably established that, in cases which reasonably present the question of the proper exercise of the constitutional power, it is not only the right, but the duty, of the United States courts to see that the right is exercised only in respect to such classes of cases as were contemplated when the power was granted, and that the crime is substantially and legally charged.

It may also be accepted as established that, as the practical administration of the arbitrary and exceptional power is at variance with the principles of the common law, and as it relates to crime, the charge of crime must be supplemented by a description answering the rules in respect to particularity and certainty.

Looking at the subject of extradition historically, it will be seen that all efforts to extend the power inconsiderately to new situations and to include new classes of cases have been stubbornly opposed both in England and in this country. Reluctance to go beyond the offenses expressly enumerated in our constitutional provision, and situations found to have been reasonably intended by the general word "crime," has been many times manifested by executives, and many times by courts charged with responsibility for the exercise of revisory control.

Without going much into the history of the contentions in respect to

limitations and extensions under judicial and executive construction, the opposition to extension of power under liberal construction is in a measure illustrated by such instances as the slave cases of Governor Seward in New York, where it was contended that no state was bound to extradite unless the crime described was recognized as such in its jurisdiction; the case of Mr. Storey, editor of the Chicago Times, sought to be extradited to Wisconsin from Chicago for libel published in the Times at Chicago, and circulated in Wisconsin, upon the theory of a constructive flight (3 Central Law Journal, 636); the case of Max Juhn, merchant of Baltimore, demanded by the state of New York for obtaining goods under false pretenses (2 Moore's Extradition, § 585); and the case of Mitchell, where New Jersey asked New York to return Mitchell, who, while in New York, instigated the burning of buildings at Jersey City, whereby life was lost, and manslaughter was charged, and where the doctrine of constructive presence was urged in order to make out a case of flight. Governor Hill denied the application, quoting from Spear (page 400) that, no matter what the consequences may be, "the Governor of a state is not to become an official kidnapper in order that the guilty may be punished." 4 N. Y. Cr. R. 601, and numerous other cases where extradition was sought to be carried to new situations.

In connection with the above case, Governor Hill promulgated a careful set of rules in respect to applications for extradition, which require, among other things, a concise definition of the crime, and that the application shall be accompanied with an affidavit that it is made in good faith and for the sole purpose of punishing the accused. 4 N. Y. Cr. R. 604.

[2] In the early stages of interstate extradition, as is well understood, it was strenuously maintained by judges, executives, and publicists that the word "crime" in the Constitution only included offenses of the higher grades; but it is assumed, for the purposes of this case, that it may now be said with tolerable exactness that, as between the states, all penal offenses, misdemeanors as well as crimes, are covered by the power delegated by the federal Constitution, and that the only question for a federal court in a habeas corpus proceeding like this is the one of due process; and that under the general question of due process are the subsidiary ones whether crime is charged and described with legal certainty against a responsible person, which is a question of law, and the question of flight, which is a question of fact, and that, in a case where there is no evidence dehors the record upon the question of flight involved, all these questions must be determined upon the face of the papers. The papers, therefore, must show what the Constitution contemplates—a responsible person, a charge of crime, which under the decisions must be supplemented by a clear and complete description of the crime, and a fleeing from justice.

It is also thought to be perfectly justifiable, for the purposes of the question now under consideration, to assume that if, upon the face of the papers, a person, without suggestion of criminal irresponsibility, is named and charged with a crime which, being described, can be seen to be a crime under the laws of the demanding state, and the descrip-

tion of the person and the crime being supplemented by a charge of flight, that extradition follows automatically, so to speak, under executive authority; in other words, that the constitutional provision, upon such papers, operates ex proprio vigore.

[3] The wisely efficient potentiality of the constitutional power of extradition results because extradition follows automatically and as of right, without investigation, in cases where all the contemplated elements of crime distinctly and unquestionably appear upon the face of the papers; and it is because of such automatic and arbitrary power exercised at variance with common-law principles (Piggott on Extradition, p. 5; Biron & Chalmers on Extradition, 1–14) that the constitutional force should not be extended to indifferent and uncertain situations in respect to which the executive is not in a position to investigate the merits.

It is because extradition involves such a drastic and unchallengeable power that all the text-books, both English and American, and all the cases, hold to rules of strictness in respect to the description of the crime, and to rules of strict construction upon questions of intendment in respect to what is shown upon the face of the papers.

[4] In order to have extradition, there must be a person, a crime, and a flight. The constitutional word "charged" must be supplemented by a description of the crime charged, and the description must be certain and complete. There must be a person, and, under a reasonable and necessary construction of the Constitution, the person must be a responsible person; and there must be a flight, and the flight must, according to Bouvier, be one to avoid punishment for the crime committed.

It must be borne in mind that all of the elements necessary to extradition must appear upon the face of the papers; but naming a person who is charged would of course be supplemented by the presumption of responsibility, and would be sufficient to establish the constitutional elements, unless the description of the person and the crime for which he is sought to be extradited involves something which reasonably overthrows the essential presumption of responsibility.

[5] In setting out its case for extradition, the state of New York describes a person escaping from a custody based solely upon the finding of a jury that he was guiltless of crime by reason of insanity, and the crime alleged as the ground for extradition is a conspiracy to escape from a custody based only upon the finding of insanity and commitment thereon. According to English and American authorities, such a finding not only overthrows the presumption of responsibility, but continues the presumption of insanity until it is proved to have ceased; and the burden of proving recovery or a lucid interval, as the case may be, lies on the person alleging the same. 19 Halsbury's Laws of England, 407, and note "k," and Langdon v. People, 133 Ill. 382, 24 N. E. 874; 27 Cent. Dig. (§ 6) 2461; Id. (§ 36) 2502–2507.

It is of course true that requisition papers, fair upon their face, even though containing nothing in the charge of crime or in the description of the person suggesting criminal responsibility, embrace the constitutional elements, and are operative because every person is presumed to

be sane and responsible until the contrary appears (27 Cent. Dig. 2458, and authorities cited), but papers which, in the description of the person and of an alleged crime involved in an escape from control because of a finding of insanity and criminal irresponsibility, do not embrace the constitutional elements, and are not operative because insanity and criminal irresponsibility being proved are presumed to continue until the contrary appears (Id. 2462).

The constitutional force is thus inoperative because it was never intended that it should be used against a person by a demanding state whose papers show upon their face that the person sought is presumptively irresponsible. It is anomalous to say that it was ever intended that the constitutional provision should operate upon persons described by a demanding state in extradition requisition papers either as idiots, insane persons, or as irresponsible infants; and this is because mental condition and criminal responsibility in such situations are always and necessarily in the field of uncertainty and doubt; and therefore it results that a crime is neither legally nor substantially charged within the meaning of the Constitution.

It is apparent that the English authorities hold rigidly to the rule of strict construction in respect to intercolonial extradition and to extradition between the different parts of the British dominions, or, as it is called there, "return of fugitive offenders," and to the idea, as shown in Pooley v. Whetham, 15 Ch. D. 435, and other cases, that extradition or forcible return was only intended to operate in clean-cut cases of crime, and, if used for ulterior purposes, that it was an abusive use.

So cautious was England, in respect to her laws in restraint of personal liberty, that her Parliament, in the various Fugitive Offenders Acts, fashioned closely after our system of constitutional interstate extradition, limited them in operation strictly to the field of crime; expressly provided that return should not operate until the alleged offender had had 15 days in which to test his liberty rights on habeas corpus; and that proceedings might be dismissed for bad faith or because of an offense being trivial. See, among the English statutes, 6 & 7 Vic. c. 34, p. 194; 33 & 34 Vic. c. 52, p. 288; 44 & 45 Vic. c. 69, p. 392. See, also, Biron and Chalmers on Extradition, pp. 90–132; Clarke on Extradition, p. 42; Act of 1870, § 26; Halsbury's Laws of England, vol. 14, pp. 403, 405, 413, and note "n."

So far removed was England from the idea of using extradition for the return of escaped lunatics upon a charge of crime, that it never used the power in such a situation or for such a purpose, but wisely provided other and different means which presented opportunities for judicial investigation and for safeguarding the rights and interests of all; as, for instance, see the Lunacy Act of 1890, 53 Vic. c. 5, §§ 86, 89. See, also, the Laws of England, by the Earl of Halsbury, vol. 19, p. 525, and notes. Moreover, and even after the Fugitive Offenders Act of 1843, which was manifestly intended to operate only upon responsible parties, remedy under habeas corpus, or through an application to commissioners, was suggested as the appropriate remedy for the restoration of an insane person escaping from guardianship asylum. See Norris v. Seed, 3 Exch. Rep. 782, 790, 792.

New York's right of custody, if the right exists, was based solely upon the idea of insanity; and, from the very nature of the case, in describing the supposed extradition crime the demanding state itself, upon the face of the papers, necessarily throws the question of criminal responsibility into the field of uncertainty, and thus it at once presents a question new to extradition law.

Careful research finds no case in this country or in England where the extradition power has been sought to return a person whose flight was from custody of such a character. The fact that among nations flights from insane hospitals, idiot asylums, and institutions for the care of indigent children of tender years have never been suggested as subjects proper to be covered by international treaties is a fact which at least historically establishes the proposition that they have never been deemed proper subjects of extradition. The fact that the return of fugitives from such custody has never been sought in this country, through the instrumentality of constitutional interstate extradition based upon alleged crime involved in escape, is strong evidence in favor of an interpretation that the constitutional provision was never intended to operate in such a field of uncertainty. The very fact of custody on the ground of infancy, idiocy, or insanity suggests irresponsibility; and it is probably perfectly correct to say that no one having to do with the creation of the constitutional provision ever dreamed of its operating upon infants, idiots, and insane persons. Are the exigencies of a case like this such as to justify extending its operation into fields into which it was never intended to enter?

Looking, as we must, in respect to the question of crime, to the face of the papers only, in a situation where the presumption of responsibility is absent, do the papers show prima facie a case of criminal responsibility, or do they show prima facie insanity or criminal irresponsibility? Do not the requisition papers and the indictment in referring to the escape and the process of custody under which the person was held, including the description of the status of the person, affirmatively introduce on the face of the papers a fact or a personal status which shifts the presumption of responsibility to one of irresponsibility, or at least a status which creates or suggests the element of uncertainty in respect to the presumption of criminal responsibility? Is the charge, which must be one of perspicuity and of particular recital of facts (Spear, 250), under the description taken as a whole, left as a substantial charge with legal certainty in the extradition sense? Do not the necessary recitals of the demanding state necessarily leave the charge of crime incomplete? It is because executive extradition involves the forcible seizure of a person and without a trial carrying him from one jurisdiction to another, and perhaps a remote one, and upon a proceeding in which he is not entitled to be heard, that the rule of strict particularity, certainty, and completeness in describing the crime has been thoroughly and completely established by abundant judicial authority as a reasonable and necessary rule of protection of personal liberty. And with this goes the other rule now unquestioned, that unless the crime is substantially charged, and unless the description sets forth with strict legal exactness and completeness a crime known to the

laws of the demanding state, there is no constitutional authority to extradite.

Substantially charged means legally charged, and these rules have reference, not to the general charge of crime alone, but to the description which must supplement the charge, and include, of course, both a description of the person and the crime. Thus it follows in this case in a very substantial sense, both in respect to the constitutional word "person" and the constitutional word "crime," that the real question is whether, in the legal and substantial sense, the papers upon their face, under reasonable interpretation, show prima facie crime and criminal responsibility; or whether they show prima facie legal uncertainty, in respect to the necessary element of criminal responsibility.

The statement of Judge Hough in the Kopel Case (D. C.) 148 Fed. 505, 506, quoting Judge Cullen in the Corkran v. Hyatt Case, 172 N. Y. 176, 182, 64 N. E. 825, 826 (60 L. R. A. 774), that "no person can or should be extradited from one state to another unless the case falls within the constitutional provision, and that the power which independent nations have to surrender criminals to other nations as a matter of favor or comity is not possessed by the states," is a good statement of the legal character of the interstate power and of the interstate relations, and is one which is abundantly supported by the legal literature on the subject. See, also, Hyatt v. Corkran, 188 U. S. 691, 23 Sup. Ct. 456, 47 L. Ed. 657. In the same line is the reasoning of Lord Alverstone in respect to the English Fugitive Offenders Act (Ex parte Percival, 21 Cox, Cr. Cas. 387):

"I think that every person who comes and asks for a fugitive offender to be delivered up under that statute must be prepared with evidence to show that that condition of the statute has been fulfilled. I think that is a very important matter, having regard to the fact that we are dealing with the criminal law, and that we must apply the general principles of the criminal law and require that the prosecutor must make out his case. We are dealing with the liberty of the subject, and with a branch of the criminal law which affects the liberty of the subject, and I therefore think that that condition should under ordinary circumstances be clearly fulfilled."

It was early discovered that oppressions would result if a simple charge of crime was recognized as the only thing necessary to put the constitutional function of extradition into operation; and it followed that the Supreme Court declared in Roberts v. Reilly, 116 U. S. 80, 95, 6 Sup. Ct. 291, 29 L. Ed. 544, that, before the Governor of a state can lawfully comply with the demand for the surrender of a person, it must appear that the person demanded is substantially charged with a crime against the laws of the demanding state, and that the person demanded was a fugitive from the justice of the demanding state. The fundamental idea thus expressed by the Supreme Court has been recognized as meaning legally charged, and legally charged has been interpreted by numerous judicial decisions and text-book writers as meaning such particularity, perspicuity, and completeness of recital as will enable the executive, upon whom the demand is made, to see that the facts constitute with reasonable certainty a crime against the laws of the demanding state.

[6] It must be perfectly correct to say that uncertainty appearing

upon the face of the papers in respect to the material element of mental condition and criminal responsibility would be as fatal to the idea of the constitutional right of extradition as would uncertainty as to a physical fact which was a necessary element of the crime sought to be described.

The right of a state to have possession of a person through extradition, not for the sole purpose of punishing him for crime, but ultimately to protect a community from which he has fled, is not an inherent or fundamental right, nor is it one which would be classed with the essential or substantial rights of a state. The right of a state to exercise guardianship control rests in the parens patriæ doctrine, and in its brief the state of New York recognizes the relationship of guardianship and wardship.

[7] A very careful examination of the numerous American text-books on international and interstate extradition, and of the very numerous decisions by American courts, and of the many writings of publicists, and of the works of the English text-writers, and of the English decisions in respect to international extradition, and the return of fugitives under the various English Fugitive Offenders Acts, discloses no suggestion of the return of a person fleeing from guardianship custody based upon a decree or finding of insanity, idiocy, or infantile irresponsibility, or from process in the nature of civil process invoked for parental and protective purposes, upon the theory that the escape involved an extraditable crime, save the single case of Amelia Leonard, an insane person, who was being held by New York in order that proceedings might be instituted for extradition upon requisition from the executive of Massachusetts, and where habeas corpus was sustained by Judge Seabury and the petitioner discharged as not an extraditable person.

So the question here for the first time is whether extradition shall enter broadly into a new field, with whatever consequences may follow from its arbitrary and exceptional character, and assert itself in behalf of a demanding state where the flight of which it complains is from a control under the doctrine of parens patriæ and from a control which, as shown by the requisition papers, was based upon mental incapacity and personal irresponsibility. Surely courts will be reluctant to blindly or inconsiderately so extend an arbitrary and exceptional body of law, unless under pressure of extreme necessity and the absence of some mode of return more consonant with the idea of reasonable opportunities for looking to the merits and of protecting personal liberty. All personal restraint and custody exercised under the doctrine of parens patriæ, or of state guardianship, is of course based upon the idea of mental incapacity, as contradistinguished from physical incapacity. It is the existence of mental incapacity that justifies the control, and it is quite correct to say that all decrees and commitments effectuating such right of control, whether based upon insanity, idiocy, or infancy, recite mental incapacity, without undertaking to define its degree; and as the function of the federal court in extradition is only to see that there is due process and a flight, and as apparently the executive of a state has no suitable power or machinery in an ex-

tradition proceeding for hearing the parties and, upon a proper hearing, to ascertain the degree of mental capacity or incapacity, it would result, though incapacity appears on the face of the papers presented by the demanding state, that upon a technical and ex parte charge and description of a crime that extradition power would operate perfunctorily alike upon all degrees of insanity, idiocy, and infancy.

No one would contend that if the degree of idiocy or insanity was in fact such that the escaped person did not know east from west, and merely wandering from hospital control in New Hampshire landed in Maine, he ought, upon a charge and description of crime, to be extradited as a criminal; yet, if it be true that the constitutional power of extradition operates automatically and arbitrarily under papers affirmatively showing the incapacity upon which the control of idiots, infants, and insane persons was based, he must be returned as a criminal, because there is no recognized machinery in the interstate extradition system for ascertaining the degree of mental responsibility.

The possibility that the constitutional right or power might be so anomalously exercised in cases involving personal liberty, and upon lines so entirely inconsistent with and so at variance with the principles of the common law (Piggott, p. 5), suggests some of the considerations of public policy which enter into the question whether extradition shall be extended to the field of guardianship and ward, and to escapes from custody under process in the nature of civil process, like the decrees under which insane persons, idiots, and infants are held in control.

Thinking simply of situations involving the custody of infant children in divorce cases under civil decrees, and escapes, and controversies between parents as to control, it is impossible to foresee the oppressions and confusions which might result if the constitutional provision as to extradition is to be accepted as a power to operate upon such abstract, drastic, and absolute lines as are urged here on behalf of New York.

The absolutism of extradition power involves neither a feasible nor a rational process for forcible return of persons escaping from idiocy, infancy, or insanity guardianship custody. It is because there have been so many attempts to use extradition power in connection with personal control and custody of weak-minded persons for property purposes, and because what has been attempted in the past will doubtless be attempted in the future in respect to such classes, that, if the constitutional provision is given such an interpretation and such a scope, it will surely sometimes be made to operate blindly, arbitrarily, and unjustly in fields of uncertainty. It is because the extradition power, in a large sense, exercises itself blindly and automatically that it should not inconsiderately enter into the field of uncertainty. Courts would be reluctant to force such a situation under rules of liberal construction, at the expense of perversion and an unreasonable extension of a carefully guarded constitutional power.

It must be borne in mind that the person here sought to be extradited is not interposing insanity against extradition as an original and independent fact dehors the record, as was done in the Charlton Case,

229 U. S. 447, 33 Sup. Ct. 945, 57 L. Ed. 1274, 46 L. R. A. (N. S.) 397, where the extradition record was fair and complete upon its face, with no suggestion of mental incapacity, and that this case is not like that, because here the demanding state must from the very nature of the situation, and does, in describing its alleged offense, introduce upon the face of the extradition record the fact that the custody under which the petitioner was held and from which he escaped was based upon a finding of insanity, and such a finding only.

If Charlton had been tried in Italy for homicide at Lake Como, and had been acquitted on the ground of insanity, and had been committed to an insane hospital under the force of such an acquittal and of such a finding, and had escaped to this country, and Italy in its papers had sought international extradition describing such a situation, his case would have been something like the one under consideration here, and a very different one from that which was decided by the Supreme Court.

In this sense, viewing the situation more as one involving a general question of public policy of vastly more importance even than one of personal right in a particular case, the facts of record are destructive of the idea that the case is one within the intended constitutional area of extradition; in other words, such papers upon their face affirmatively put a negative upon the idea that the power of extradition is operating as was intended in the field of strict crime.

The leading case on the question of the necessity of particularity of description is that of People v. Brady, 56 N. Y. 182, where it was held in effect that a vague and unsatisfactory charge of crime was not sufficient, and that a full and explicit description of the crime by the demanding state was a condition precedent to the obligation to surrender. This case is discussed at considerable length by Moore in his work on extradition, where other authorities are cited (including Ex parte Stanley, 25 Tex. App. 372, 8 S. W. 645, 8 Am. St. Rep. 440; State v. O'Connor, 38 Minn. 243, 36 N. W. 462), with explanations of the reasons for the rule. See Moore on Extradition, § 634, to and including section 640. And the doctrine of particularity was recognized in New York in the later case of Corkran v. Hyatt, 172 N. Y. 176, 191, 193, 64 N. E. 825, 60 L. R. A. 774, sustaining habeas corpus and the idea of the right and duty of the court to review the acts of the executive in respect to the questions involved in the description of the crime and the allegation of flight. And this decision was sustained by the Supreme Court in 188 U. S. 691, 23 Sup. Ct. 456, 47 L. Ed. 657.

The rule requiring that a crime shall be legally charged and described with particularity and certainty is several times stated by Spear in his book on Extradition, which was characterized by Mr. Justice Miller in United States v. Rauscher, 119 U. S. 407, 417, 7 Sup. Ct. 234, 30 L. Ed. 425, as a very learned and careful work. See pages 289, 361, 365, 369. The reason for the rule is apparent, and has been so generally recognized by the courts as to render discussion and citation of authorities unnecessary, and it will not be pursued further than to say that the rule does not mean that the crime shall be described with such technical precision as would stand the test of all questions which

might be raised against an indictment, but that it does mean that the facts shall be so fully and particularly recited in the requisition papers that the state upon which demand is made can see that it presents such material facts as will include the elements of crime contemplated by the constitutional provision, which means, of course, a description of the crime and a description of a responsible person.

As, for instance, to use an extreme illustration, if it were Mary Jones who were charged with an extraditable crime, and the description of the person rested with her name and place, it would, of course, aided by the usual presumption of responsibility, be quite sufficient; but if in describing the crime it was said that Mary Jones was a child four years of age, who was guilty of the crime of conspiracy in escaping from guardianship custody decreed in a divorce case, the description would render the charge incomplete and put the case outside of the field of extradition.

It is strongly urged by counsel for the petitioner in this case that the real and substantial purpose of the extradition sought is not to punish for the supposed misdemeanor involved in the escape, but to secure a return of the petitioner under extradition power upon a charge of crime, for the ultimate purpose of reconfinement at the Matteawan Hospital as an insane or dangerous person.

I think the reasonable interpretation of the entire proceeding, including the statement of counsel (Record, p. 154):

"We expect to take this man back; we expect to try him and punish him for his crime; and, when he has taken his punishment for his crime, we expect to put him where he belongs and where he will not be a menace to the public"

—is at least that the sole purpose is not to punish for the supposed crime of conspiracy to escape from guardianship custody.

Although the general theory of the extradition law is that it operates only in the strict field of crime, and that extradition process is only to be used for the return of persons for the sole and genuine purpose of punishment for crime, and though recommitment at Matteawan would not be punishment for crime, but detention under guardianship relations and civil process, and though there are very many cases and publications which broadly discuss, with strong expressions, the question of bad faith and the question of the misuse of extradition process for ulterior purposes, I am not inclined to base my decision upon that phase of the controversy between the petitioner and the state of New York, or to discuss it further than to cite In re Cannon, 47 Mich. 481, 11 N. W. 280, and the various opinions in the English case of Pooley v. Whetham, 15 Ch. D. 435.

The petitioner in this case was tried before a jury in New York City in 1908 under an indictment for an alleged homicide, and was acquitted by the jury on the ground of insanity. It was thereupon ordered that he be detained in safe custody and be sent to the Matteawan State Hospital, there to be kept until discharged by due course of law. The hospital was one established by the laws of New York to be used for the purpose of holding in custody and caring for such insane persons as might be committed thereto. In August, 1913, the petitioner es-

caped from such custody, and, being found in New Hampshire, was taken into custody under state process, and while in the custody of the New Hampshire authorities, under requisition papers from New York, he petitioned for habeas corpus upon alleged constitutional grounds.

New York in its brief expressly disclaims that its extradition proceeding is in any sense based upon the idea that the escape from the state asylum in Matteawan is a crime under the laws of the state of New York, or that the indictment is for an escape, or for a conspiracy to commit the crime of escape. And it is true that, while the New York statutes do provide that it shall be a crime or misdemeanor to escape from custody under a sentence for crime or misdemeanor, and for recapture of persons escaping from such custody under a sentence of imprisonment for crime (Birdseye, Cumming and Gilbert's Consolidated Laws of New York, p. 4023 [Penal Laws (Consol. Laws, c. 40) §§ 1693, 1694]), it has not been made to appear that there is in fact any New York statute making it a crime to escape from hospital custody under process like that in question here.

New York in its brief bases its case upon the idea that that state was the legally appointed guardian of Thaw while insane, and upon the allegation of a conspiracy to pervert and obstruct justice and the due administration of the law, which, they say, is a misdemeanor under the laws of the state. Therefore all thought that the custody of Thaw is sought as a matter of punishment for a homicide must be dismissed as having nothing to do with the legal or constitutional questions involved.

The indictment, without even alleging the then existence of insanity as a necessary basis of a continuing right of control, recites the nature of the alleged conspiracy, and refers to the custody under which the petitioner was held. It is conceded that an overt act, though not a necessary element at common law, is a necessary element of conspiracy under the statutes of New York. It is contended, however, that, though the act of escape was not a criminal act, the act of walking out, or, in other words, of escaping without violence, should be accepted as an overt act under the New York statutory criminal law of conspiracy. The act of walking out, however, is not relied upon as the sole overt act, because it is argued that entering the automobile which was to take him away, and perhaps other things incidental to the flight, should be accepted as overt acts in furtherance of the conspiracy for a flight, whereby justice and the due administration of the law were to be perverted.

The petitioner was in confinement under civil process at Matteawan Hospital in Dutchess county, and the indictment was presented in the city and county of New York. Neither the place of the alleged conspiracy nor the means or manner of developing the escape, or of the knowledge or intention of obstructing justice and the due administration of the law, are with particularity, if at all, set out in the indictment, except it is said that certain of the alleged conspirators drove an automobile to Matteawan, where it awaited the petitioner, and where

the petitioner entered the car, from whence he was carried out of Dutchess county and out of the state of New York.

As to requirements in respect to a particular description of the means, where the overt act is not a crime, see Pettibone v. United States, 148 U. S. 197, 203, 206, 13 Sup. Ct. 542, 37 L. Ed. 419; State v. Burnham, 15 N. H. 396, 402; State v. Parker, 43 N. H. 83; State v. Potter, 28 Iowa 554; State v. Stevens, 30 Iowa, 391; State v. Jones, 13 Iowa, 269; State v. Roberts, 34 Me. 320; Commonwealth v. Shedd, 7 Cush. (Mass.) 514; Commonwealth v. Hunt, 4 Metc. (Mass.) 112, 125, 38 Am. Dec. 346; Lambert v. People, 9 Cow. (N. Y.) 578.

The sufficiency of an indictment involved in an extradition proceeding is open to inquiry (In re Terrell [C. C.] 51 Fed. 213), and the sum of the contention in respect to the indictment here is that even though the act of walking out and walking away from the hospital and out of the state would not be a crime, that the act though lawful, when associated with a plan to have a carriage or an automobile there to carry the escaping person away, the escape would become a crime. Such a position involves a considerable measure of refinement in order to bring the case within the Constitution, and, while there is apparently serious doubt whether the indictment sets out a situation which clearly discloses a crime or misdemeanor under the laws of New York, it is not deemed that the exigencies here demand a careful analysis of the question with a view to its definite technical determination, because it would at least require that rules of liberal construction should be invoked in order to reach such a conclusion, and rules of liberal construction are not permissible where the exercise of peremptory force against personal liberty is involved. I prefer, rather than to make the technical analysis of the question of crime in such a situation, to put my decision on the ground that the papers reasonably negative the idea of criminal responsibility, and that for that reason the charge of crime in the constitutional sense is unsubstantial and incomplete.

Knowledge or appreciation of wrongdoing is always an essential of crime, and it is only a statement of a natural truth that every person who is held in restraint upon the ground that he is mentally impaired feels that he is wrongfully restrained. A man who is in fact sane and level knows that his restraint under such circumstances is wrongful; and, as a rule, the man who is insane or mentally impaired believes that he is sane and that his detention is wrongful; and, as a general rule, the insane person actually believes that it is his custodians, or those who put him in custody, rather than himself, that are insane.

The history of the world is full of attempts of persons to regain liberty, involving escapes from political restraints and punishments, military confinements, and confinements upon the ground of insanity, idiocy, and imbecility; and it is rare that such attempts have been viewed as offenses in the strict criminal sense. Therefore, if the indictment, under liberal analysis, describes a technical misdemeanor, it is not deemed to be a description of a crime so substantial as to answer the constitutional substantive requirement of a charge of crime, and to become the foundation for carrying a great body of law into fields which it has never before entered.

Among other things which the case of Roberts v. Reilly, 116 U. S. 80, 6 Sup. Ct. 291, 29 L. Ed. 544, decided are the propositions that a person sought to be extradited is entitled to invoke the judgment of the judicial tribunals by writ of habeas corpus upon the question of the wrongfulness of his arrest and imprisonment, and upon the question whether he is a fugitive from justice in the sense of constitutional extradition, and that both of these questions are subject to judicial review. It is true that the question whether a given person is a fugitive from justice is a question of fact to be determined upon the face of the papers, unless attacked by proofs, and it is a principle of law that, where there is no controversy about the facts as stated, the question of fact is to be determined upon reasonable construction and under reasonable processes of deduction.

[8] Now is it probable, or even possible, to reach the conclusion, through an examination of the history of this case as presented by the requisition papers of New York, that the petitioner was fleeing from his escape or that he ever thought that he was fleeing from the misdemeanor involved in his escape? Of course he was not. It is the purest fiction to say that the man was fleeing from the escape. His flight was in every substantial sense a flight, not from the crime which he was committing in walking out of Matteawan, but from incarceration and guardianship environment. Nothing could be more axiomatic than the proposition that a man who was restrained of his liberty, a restraint to which he was objecting as unwarrantable, who escapes without force, is fleeing from the objectionable control rather than from the possible crime involved in his escape. Under reasonable inference, upon the face of the papers from New York's description of the escape, in every sense save an extremely fictional one the flight was from Matteawan environment, not from the crime of escaping and fleeing from environment.

Flight is a fundamental, substantial, and necessary element of the constitutional power of extradition. It must be established in order that the powers shall operate. Though it has been said in some of the cases that presence in a state at the time of the alleged crime, and presence in another state at the time extradition is sought, is sufficient to create the contemplated constitutional flight, such utterances were not in cases where it was proposed to extend the body of extradition law to classes of cases upon which it had never before operated. It is where the effect of the extension of arbitrary and exceptional power is to make it operate upon new classes, and in restraint of liberty, under principles operating in derogation of the common law, that courts hesitate to take the step except upon substantial grounds and for substantial and necessary reasons of justice.

In a case like this, where the elements must be substantially established, the constitutional element of flight must have some causal relation to the specific crime alleged as the ground for invoking the constitutional power of extradition. It is entirely technical, unsubstantial, and the merest fiction to say, and it would be a bold man who would maintain, that one confined for insanity, and escaping, was fleeing from the escape rather than from the confinement of which he

was complaining. It is for these reasons, under the circumstances of this case, that I think the flight should not be accepted as the kind of a flight contemplated by the framers of the Constitution when they created the right of extradition for crime.

In the rescript handed down in this case December 17th, something was said about the question of the constitutionality of the New York statute, under which the petitioner was held at Matteawan, and that such a question under the circumstances would not ordinarily be entered upon by a judge of first instance. I still hold to that view, although counsel on both sides, under commendable research, have fully argued in respect to its validity.

Contrary to conditions in England, where a commitment is made upon a verdict of "guilty, but insane," under the New York statute the commitment was upon a verdict of acquittal because of insanity, and thus there is presented a question perhaps essentially different from questions raised in criminal procedure in England. The point here is that, upon the facts being certified that he was acquitted upon the ground of insanity, he was incarcerated at Matteawan without any evidence of his mental condition at the time of the committal other than that which was addressed to the jury and had reference to his mental condition at the time of the alleged homicide, while the statute only authorizes confinement upon mental condition existing at the time of commitment, and that the commitment was until he was discharged by due course of law, while the statute which authorizes the commitment only presupposed confinement until the person committed became sane, and that the statute, which assumes to authorize restraint until sane, operates wrongfully, because a person might, though insane, be altogether helpless and harmless, and because the statute furnishes no adequate remedies for release from the kind of custody created by virtue of the statute in question and upon the proceedings subsequent to the acquittal.

A question arising in the Supreme Court from the state of Washington, in the case of Urquhart v. Brown, 205 U. S. 179, 183, 27 Sup. Ct. 459, 51 L. Ed. 760, upon a statute similar to this, though the case was decided upon the ground that the question should have been raised directly from the decision of the pending case in the state of Washington rather than collaterally upon habeas corpus, the question involved in the attack upon the constitutionality of the statute was expressly left as an open question. It is because a constitutional question like this has been before the Supreme Court and left undecided, and because it would not be useful for me to enter upon a discussion of the constitutional question, and because I think it need not be entered upon in this case for the reason that the papers do not present an extraditable offense that I leave the question of the validity of the New York statute, under which the petitioner was held, without discussion.

It is sometimes contended in support of a proposition which is being urged that there ought to be a remedy to compel certain results, and that, if the one urged fails, the situation is remediless. It does not seem to me that that argument obtains here. Although the question is not directly involved, and although it is quite unnecessary for me to

make any suggestions about it, I should suppose, though guardianship has no positive force extraterritorially except under rules of comity, that, under the tendency of modern statutes and decisions to defer to the law of the domicile and to support the authority of the guardian, under our interstate relations, as well as in England under the common law and by statute, a guardian, whether a natural guardian, a guardian created by the court for the protection of infants, idiots, or insane persons, or whether it is a state exercising the right of guardianship control under the doctrine of parens patriæ, for the purpose of protecting the unfortunate person and the community, might, in case of escape, take the evidence of its authority and of the escape, and take the ward into custody wherever he was found, and that the right of guardianship control could be exercised against him, not because he was a criminal, but because he was a ward subject to guardianship control. Such supposed right of custody being asserted, if the ward objected to return and restraint, he could have his orderly proceeding in the courts; and if the guardian's right of control was interfered with, either by the ward or by members of the public, he could resort to the courts for suitable process to protect and effectuate his right; and habeas corpus would be a plain, orderly, appropriate, and adequate remedy in the hands of the guardian if obstructions are thrown in his way, and in the hands of the person sought to be restrained if he sees fit to oppose the return. Under such a proceeding, with the parties present, the scope of the inquiry would permit considerations of comity and discretion and of the mental and physical well-being of the ward whose restraint was sought.

If it were an infant escaping from guardianship custody created in a divorce case, and the controversies about the custody of children in such situations are numerous, and getting more so, a leading consideration would be its physical and mental well-being. If it were an idiot of irresponsibility and in ill health, the same, with doubtless other considerations, would be within the scope of judicial inquiry. If it were a person who had escaped from custody based upon insanity or dangerous mental conditions at the time of the commitment, and if, at the time his recovery is sought, his mental condition was an open one under the decisions of the state creating the guardianship, and the right of control being based solely upon mental condition, that question, and others quite likely, would be a proper subject of inquiry in a proper proceeding raising the question of the right of the guardian to continue his control. And, in all situations with respect to idiots, infants, and the insane, the question of physical and mental well-being would become an important, and perhaps a leading, consideration.

Though there may not be any case where a state, in its capacity as guardian under the parens patriæ doctrine, has exercised this right, the principle is quite within hundreds of cases that have been decided with respect to guardianship control, but I only cite the opinion of Judge Walker in Hanrahan v. Sears, 72 N. H. 71, 54 Atl. 702, 3 Blackstone's Commentaries, pp. 132, 133, and note, Peck, Domestic Relations, § 143, and cases cited in notes, as sufficiently suggesting the principle and the line of authorities.

My conclusion is that the constitutional right of extradition for crime does not reasonably apply itself to such a situation as this, where the right of control by the demanding state resides in a decree of custody based upon insanity,. and where its papers upon their face negative the idea of personal criminal responsibility. It is further thought that it would involve forced and fictional reasoning to make a flight of the character of. the one in question the kind of a flight contemplated by the Constitution as a basis for extradition.

It results that an order will be made sustaining the writ, and that the petitioner be discharged from the extradition process under which, he was held at the time his petition for habeas corpus was brought upon constitutional grounds.

It has been understood from the beginning that, whichever way this case might be ·decided by me, it would be taken to the Supreme Court. Therefore no formal order will be made either sustaining the writ or discharging the petitioner until the aggrieved party has had an opportunity to perfect its appeal. When there is such readiness, and when convenient to counsel to have the operation of the appeal put into effect, the orders will be made and the discharge suspended by some appropriate order pending the appeal.

My reasoning about this case involves no criticism upon the act of Governor Felker in ordering extradition. His action was based upon the idea that the scope of a Governor's right to investigate and deal with judicial and constitutional questions was limited, and that, except in clear cases of failure to charge a crime, that extradition should. go as of course under the perfunctory mandate of the Constitution; yet he expressly and wisely, under the discretionary power which he possessed, guarded the humane idea, expressed in the English statutes, that the warrant should not operate until the petitioner had had an opportunity, under a writ of habeas corpus, to test his rights in the courts, which were supposed to be possessed of power and machinery,. as to the legal and constitutional questions, which the executive did not possess; the Governor expressly saying that "such procedure affords Mr. Thaw an ample remedy before a tribunal having jurisdiction of such extraordinary remedies, with the power to issue final process. for carrying its judgments into effect."

Now as to bail. This question, differently from the questions arising upon the face of the requisition papers, requires consideration of the actual fact of present mental condition because, under the constitutional power, the exercise of the right of extradition depends alone upon what appears upon the face of the papers, while under the motion for bail there arises on the public phase a question of present mental condition as a matter of fact.

On the 6th day of December, 1913, the petitioner moved for bail, basing his motion upon the ground that under the laws of New York, as he was indicted for misdemeanor only, he was entitled to bail as of right, asserting that his alleged co-conspirators had all been admitted to bail. The motion was discussed orally upon the assumption on the part of New York, as well as others, that the petitioner was entitled

to bail unless it would be dangerous to the community to set him at large.

A rescript was handed down December 17th in which the right of bail was somewhat discussed, with the conclusion that the petitioner was entitled to it unless his liberty would be a menace to the community. Both parties expressed a desire to be heard upon that question and to produce witnesses and records. It appeared in argument that the last hearing on Thaw's mental condition before Judge Mills in New York occupied something like 7 weeks, and that 77 witnesses were examined orally, and that the record contained the testimony of 49 other witnesses; both classes including a large number of experts who were called on the two sides. Counsel were informed that the question of bail was, aside from the right of Thaw, a question with a public phase, and that it was not proposed to enter upon an extended adversary hearing as to his mental condition, and that it was thought that public exigencies, if any, could be answered by a nonpartisan commission to make investigations and to answer the question in respect to public danger without an adversary hearing.

Acting upon the theory of the New York cases relating to the petitioner's mental condition (Peabody v. Baker, 59 Misc. Rep. 359, 110 N. Y. Supp. 848; Peabody v. Chanler, 133 App. Div. 159, 117 N. Y. Supp. 322; People v. Lamb [Sup.] 118 N. Y. Supp. 389), the substance of which is that Thaw was held in New York, not for punishment, because he had been acquitted, but only as a temporary expedient, and that there was no pretense of holding him a moment after his restoration to a nondangerous condition, and that the question of mental condition was open and was not one within the res judicata rule in the sense that its determination as of to-day was to control the future, and of my own motion, and without suggestion from either party as to personnel, a commission was created charged with the duty of making such examinations as it should see fit, under certain limitations.

The purpose was, not only to have a commission in whose judgment I should repose more confidence than in my own, based upon an adversary hearing, but one which would command the confidence of the community. Therefore the commission was made to consist of one of the most prominent lawyers in New England and three expert alienists of high standing. The work of the commission was undertaken with the idea that it should be entirely nonpartisan, and in aid of justice, and even without any assurance that it was certain that any compensation could be made for the labor performed. Indeed, the work in fact was entered upon quite in the sense of a discharge of public duty, at the request of the court, in aid of justice.

The reasons for appointing the commission appear in the rescript of December 17th, and the findings in respect to nondanger appear from the report which is a part of the record. After the report was filed, the petitioner moved for leave to introduce witnesses, consisting of alienists who had seen and examined him since his escape, and by whom the petitioner's counsel expressed a wish to supplement the report of the commission as to present mental condition. This motion

is denied on the ground that the purpose of appointing the commission was to avoid a public adversary trial as a thing unnecessary under the circumstances.

On January 13, 1914, the petitioner moved for a hearing on the question of bail, and that the report be accepted and adopted. After hearing the parties, the report of the commission is accepted and approved as sufficiently showing the mental condition of Thaw, so far as it is involved in the question of bail.

Since the rescript of December 17th an examination of authorities has raised a query in my mind whether the various statutes and Constitutions creating the absolute right of bail in misdemeanor cases, which ordinarily operate as an imperative mandate upon courts, are to be accepted in cases arising in habeas corpus proceedings in respect to interstate extradition. The English case of Queen v. Spilsbury, L. R. (1898) 2 Q. B. D. 615, and Wright v. Henkel, 190 U. S. 40, 23 Sup. Ct. 781, 47 L. Ed. 948, Moore on Extradition, vol, 2, pp. 973, 974, Piggott on Extradition, p. 94, Ex parte Erwin, 7 Tex. App. 288, and Ex parte Gaynor & Greene, 9 Can. Cr. Cas. 255, are among the authorities which discuss the question of the right of bail in habeas corpus proceedings interposed upon extradition process.

I have no doubt of the right of the court to grant bail under the circumstances of this case; but as the question is an interlocutory one, of which the petitioner has the right to avail himself at any time and at any stage of the proceedings, and as the case is about to go out of the control of this court and into the Supreme Court, and as Supreme Court rule 34 (32 Sup. Ct. xiii) has an important and perhaps a controlling bearing upon the question, I am disposed to leave the motion for bail undetermined, without prejudice.

I am not influenced at all upon this question by any fear that the community would be in danger by giving the petitioner liberty under bail, because I accept the report of the commission, based as it was upon nonadversary investigations and examinations, and upon proofs of absence of indications of personal violence since commitment to Matteawan, supplemented by my own observations of the man at the several hearings, as sufficiently establishing nondangerous mental condition, so far as it is involved in the question of bail, and that any supposed danger to the community through liberty under bail is so remote as not to warrant his being deprived of liberty of bail upon that ground. If the broad provisions of rule 34 are to be interpreted as covering questions of bail in habeas corpus, where the person is taken from extradition custody, they are entirely conclusive of the question here in favor of bail, because in general terms they cover all habeas corpus cases. That that rule is something more appropriate for interpretation by the Supreme Court than by this court is the reason for leaving the question of bail undecided. I am not at all certain that I am not denying a plain right, and doing the petitioner injustice, by leaving this question undecided. If such is the case, an opportunity is open for him to seek redress from the higher court before whom this case will soon be pending.